1

2

3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TESORO REFINING & MARKETING
COMPANY LLC,

              Plaintiff,

    v.

PACIFIC GAS AND ELECTRIC
COMPANY,

              Defendant.

Case No.  14-cv-00930-JCS

**ORDER DENYING MOTION FOR
LEAVE TO AMEND COMPLAINT**

Re: Dkt. No. 69

## I.    INTRODUCTION

This case concerns a power outage at the Golden Eagle Refinery (the "Refinery") owned by Plaintiff Tesoro Refining & Marketing Company LCC ("Tesoro").  Tesoro and Defendant Pacific Gas and Electric Company ("PG&E") entered a stipulation in May of 2014, agreeing that Tesoro would amend its complaint to remove a request for punitive damages, but that Tesoro could reassert that request no later than seventy-five days before the close of fact discovery. Although fact discovery closed in April of this year, Tesoro now moves for leave to further amend its complaint to seek punitive damages, based on purportedly relevant information not produced until after the stipulated amendment deadline.  The Court held a hearing on September 25, 2015. For the reasons stated below Tesoro's motion is DENIED.[1]

## II.   BACKGROUND

### A.    Factual Background

The following summary is intended only as an overview, with additional purportedly relevant facts discussed in more detail below in the context of the parties' disclosures and

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

1  discovery.

2      Although the Refinery primarily drew power from an adjacent cogeneration plant (the

3  "Cogen") operated by non-parties Foster Wheeler Martinez, Inc. and Martinez Cogen Limited

4  Partnership (collectively, "FWM" or "Foster Wheeler"),[2] Tesoro had an agreement for standby

5  electricity service from Defendant Pacific Gas & Electric Company ("PG&E").  In November of

6  2010, an unexpected disruption of PG&E's transmission lines to PG&E's Tidewater Substation

7  (the "Substation") isolated, or "islanded," the Refinery, the Cogen, and local PG&E customers

8  from PG&E's electrical grid, with the Cogen as the only remaining source of power for the

9  Refinery and the other local customers.  The Cogen tripped offline, causing an unplanned loss of

10  power at the Refinery and allegedly damaging the Refinery.

11      **B.     Procedural History and Discovery Process**

12      Tesoro's original Complaint in this action included a request for punitive damages on

13  Tesoro's second cause of action for negligence or gross negligence.  Compl. (dkt. 1) ¶ 49.  On

14  May 5, 2014, PG&E moved to dismiss only Tesoro's punitive damages claim.  *See generally* Mot.

15  to Dismiss (dkt. 18).  Two weeks later, the parties filed the following stipulation:

16          Plaintiff Tesoro . . . and Defendant [PG&E] stipulate as follows:

17          WHEREAS, on May 5, 2014, PG&E filed a Motion to Dismiss
            Plaintiff's Claim for Punitive and Exemplary Damages (docket no.
18          18), currently scheduled for hearing on July 11, 2014,

19          WHEREAS, Tesoro agrees to withdraw its claim for punitive and
            exemplary damages without prejudice to amendment and subject to
20          the terms of this Stipulation,

21          WHEREFORE, THE PARTIES HEREBY STIPULATE:

22          1.  Tesoro will amend its complaint by no later than May 26, 2014,
            for the sole purpose of removing its claim for punitive and
23          exemplary damages;

24          2.  Tesoro may reassert a claim for punitive and exemplary damages
            no later than 75 days prior to the close of fact discovery, provided
25

26      ———————————
        [2] FWM was briefly a party to this litigation after PG&E filed a third-party complaint against it.
27  The Court granted FWM's motion to dismiss that complaint with prejudice on August 29, 2014.
    *See Order Granting Third-Party Defendant's Motion to Dismiss (dkt. 50); Tesoro Refining &*
28  *Mktg. Co. LLC v. Pac. Gas & Elec. Co.*, No. 14-cv-00930-JCS, 2014 WL 4364393 (N.D. Cal.
    Aug. 29, 2014).

United States District Court
Northern District of California

United States District Court
Northern District of California

such amendment is consistent with federal and local rules and, if necessary, subject to this Court's leave;

3. In the event that Tesoro reasserts its punitive and exemplary damages claim, PG&E may seek dismissal of such claim on any relevant grounds, except that it may not assert that Tesoro has, by virtue of its filing of an amended complaint as set forth in this Stipulation, conceded any legal or factual issues or waived any argument in this case, including without limitation, the factual statements and legal arguments set forth in PG&E's May 5, 2014, Motion to Dismiss;

4. Except as set forth in Paragraph 3, above, this Stipulation shall not constitute an admission of fact or waiver of legal argument by either party.

5. The parties shall bear their own costs and attorneys' fees.

Stipulation (dkt. 23).

Tesoro's initial draft of the stipulation did not include a time limit for amendment, but PG&E's counsel proposed, among other changes, adding a deadline before the close of discovery "to ensure [that] PG&E would have sufficient time to conduct discovery in response to any claim." Edelstein Decl. (dkt. 83) ¶ 8 & Ex. 1. Tesoro's counsel responded that he was "fine with those changes," resulting in the final version of the stipulation recounted above. *Id.* Ex. 1.

The Court endorsed the parties' stipulation as "so ordered" on May 21, 2014, and Tesoro filed its currently operative First Amended Complaint two days later, without a claim for punitive damages. *See generally* Order Granting Stipulation (dkt. 27); 1st Am. Compl. (dkt. 28). On September 5, 2014, the Court entered a Case Management and Pretrial Order providing that "[a]ll non-expert discovery shall be completed by April 3, 2015," thus effectively setting a deadline of January 18, 2015, seventy-five days before the discovery cutoff, for Tesoro to add a punitive damages claim pursuant to the stipulation. *See* Case Management & Pretrial Order (dkt. 52) ¶ II.A.

Tesoro served its first request for production of documents on July 29, 2014. De Recat Decl. (dkt. 70) ¶ 2; Edelstein Decl. ¶ 12. Although PG&E's response was due August 28, 2014, de Recat Decl. ¶ 3, counsel for the parties met on August 21, 2014 and "agreed to a rolling production of documents," Edelstein Decl. ¶ 13. PG&E produced documents on November 17, 2014, January 30, 2015, February 9, 2015 and May 1, 2015, with the final set produced in

1    response to Tesoro's third request for production served on March 4, 2015.[3]  De Recat Decl. ¶¶ 3,

2    8−9; Sias Decl. (dkt. 84) ¶¶ 19, 27−28.  Tesoro did not make its second request for production or

3    propound any other discovery requests until sometime after January 18, 2015.  *See* Sias Decl. ¶ 26.

4           In comparison, PG&E served its first request for production on Tesoro on July 9, 2014

5    (although the parties agreed to deem the request served later that month to allow additional time to

6    respond), and Tesoro did not produce any documents until January 9, 2015, despite the parties'

7    agreement "to attempt to make an initial production of documents in advance of" their December

8    11, 2014 mediation.  Edelstein Decl. ¶¶ 11, 16, 18−20; Sias Decl. ¶¶ 10, 18, 20−21.  According to

9    PG&E's counsel, "Tesoro's January 9, 2015 production consisted largely of a Project Agreement

10   between Tesoro and Foster Wheeler, a copy of which Foster Wheeler had already produced in

11   response to a subpoena, and documents concerning Tesoro's damages that it had provided to

12   PG&E during the claims process."  Sias Decl. ¶ 23.

13          Tesoro served its first deposition notice on January 30, 2015, and in total noticed seven

14   depositions before the close of fact discovery.  Edelstein Decl. ¶ 23.  "PG&E made each witness

15   available for deposition in that period," but due to a conflict with Tesoro's counsel's family

16   obligations, two PG&E employees' depositions were postponed from March of 2015 to May, and

17   one of those two was later rescheduled again to July 20, 2015 based on Tesoro's counsel's

18   availability and the employee's previously scheduled vacation.  *Id.* ¶¶ 23−28.  During discussions

19   about the timing of that deposition, Tesoro's counsel told PG&E's counsel "that he was fine with

20   taking [the] deposition at any time before trial."  *Id.* ¶ 27.  PG&E proposed extending the fact

21   discovery deadline to allow time for the delayed depositions—which would have also extended

22   the stipulated amendment deadline, although there is no indication that either party considered that

23   effect at the time—but Tesoro refused, and the parties ultimately agreed to leave the April 3

24   discovery cutoff date in place but to allow depositions noticed before the deadline to occur after

25   the deadline.  *Id.* ¶ 24.

26   _____

27         [3] Although these are the only productions specifically referenced in the declarations submitted
     in connection with the present Motion, it is not clear whether PG&E may have made other
28   productions.  For example, the declarations do not specifically discuss Tesoro's second request for
     production or any response thereto.

United States District Court
Northern District of California

Tesoro's counsel did not express any concern about PG&E's document production before the stipulated January 18, 2015 amendment deadline, and never asked to revisit the stipulation before filing Tesoro's present Motion on August 5, 2015. *Id.* ¶¶ 21−22; Sias Decl. ¶¶ 24−25. The Motion seeks to add a claim for punitive or exemplary damages to Tesoro's "Negligence/Gross Negligence" claim, as well as a number of factual allegations in support of such damages. *See* Mot. Ex. 1 (proposed second amended complaint) at, *e.g.*, ¶¶ 21−26, 34, 57.

### C.    Timeline of Tesoro Learning Purportedly Relevant Information

Much of the present dispute regarding the timeliness of Tesoro's proposed amendment relates to when Tesoro learned facts that it considers relevant to a punitive damages claim. Accordingly, the following timeline is generally organized by when documents and information were disclosed to Tesoro, not when documents were generated or when underlying events described therein occurred.

#### 1.    Aftermath of the Outage: Direct Discussions Between PG&E and Tesoro[4]

In a conference call on December 16, 2010, PG&E informed FWM and Tesoro that it had transitioned the relevant circuit breakers to "manual mode" to avoid the circumstances that led to the outage. Sias Decl. Ex. 10 (letter from FWM summarizing meeting). PG&E also disclosed "that the synchronization switches at the tidewater substation are not to PG&E's current standards," although PG&E still "want[ed] to further investigate the root cause of [the] outage." *Id.*

On January 27th, 2011, PG&E presented a timeline of certain events related to the outage. *Id.* Ex. 29 (internal Tesoro email summarizing teleconference with PG&E). At that time, "Tesoro concluded from PG&E's review of the records that there was no awareness within PG&E during the 50 minute window from 1509," when PG&E's timeline shows that a circuit breaker was opened but an alarm was not acknowledged, "through 1559 that Tidewater Substation was in a vulnerable position, and that there was no action taken regarding Tidewater until at least after the

---

[4] This section summarizes the disclosures addressed in the parties' arguments, but is not an exhaustive record of all meetings between PG&E and Tesoro during this period. *See, e.g.*, Sias Decl. Ex. 12 (minutes of a January 13, 2011 meeting).

United States District Court
Northern District of California

1559 [second circuit] breaker open." *Id.* (using four digit numbers to denote twenty-four hour

time).  Tesoro described PG&E's response as follows:

> PG&E, as part of an existing program in effect prior to November
> 11th, has done the following:
>
> 1.  Reminded operators of the necessity to acknowledge alarms
>
> 2.  Worked on clarifying alarm priority and on improving situational
> awareness, including identifying alarms that require immediate
> response, and highlighting key alarms on the control screens.

*Id.*

     In February of 2011, the parties discussed issues related to the interconnection of the

Refinery, the Cogen, and PG&E's Substation and grid, including "underfrequency" specifications

and whether a "load shedding" scheme was in place.  *See* Sias Decl. Exs. 13, 14, 30−32.  These

talks concerned both improving the reliability of PG&E's power transmission to the Substation

and contingencies for maintaining a supply of electricity from the Cogen to the Refinery in the

event of a future Substation outage.  *See id.*  It is not clear what, if anything, PG&E told Tesoro

and FWM at that time about the presence or absence of a load shedding system.

### 2.   July 2011: PG&E Root Cause Analysis

     In June of 2011, approximately seven months after the outage (and more than two and a

half years before Tesoro initiated this action), PG&E released a "Root Cause Analysis" of the

incident.[5]  De Recat Decl. Ex. B; Sias Decl. Ex. 15.  Among other issues, the Root Cause Analysis

identified that synchronization switches, or "synch switches," for three circuit breakers at the

Substation failed to meet the "current PG&E standard" because they lacked "keyed face plates

such that only one switch could be left in the 'on' position."  De Recat Decl. Ex. B at PG&E0732.[6]

Based on the configuration of the transmission lines at the Substation, placing more than one of

the switches in the "on" position at the same time could result in a loss of power.  Accordingly,

> PG&E standard synch switch installation currently includes both of
> the following design mechanisms intended to prevent the incorrect
> operation of the synch switches:

---

[5] Although this document was produced through discovery in November of 2014, de Recat
Decl. ¶ 4, PG&E first shared it with Tesoro and FWM on June 3, 2011, Sias Decl. Ex. 15.

[6] To conserve space, this Order's citations to Bates numbers omit all but one leading zero.

> 1.  The switch is operated by a removable keyed handle.  There is a mechanical interlock that only allows the handle to be removed in the "OFF" position.
>
> 2.  There is one and only one keyed handle per substation control room.

*Id.* at PG&E0736.  In other words, whenever one switch is in the "on" position, there is no way to turn any other switch to the "on" position without first turning the first switch off so that the handle can be moved to the second switch.

At the Tidewater Substation, there was only one handle, but the synch switches did not have a mechanical interlock, thus allowing the handle to be removed with a switch in the "on" position and more than one switch to be turned on at the same time.  *Id.*  The model of switch installed at the Substation required a separate faceplate to add the interlock feature, which had not been installed.  *Id.*  When a maintenance supervisor arrived at the Substation after the outage, he observed that two synch switches were in the "on" position.  *Id.*

The only short-term corrective action recommended in the Root Cause Analysis was to replace the synch switches with new models that have the mechanical interlock function, and to determine whether other PG&E facilities had the same problem (subsequent investigations found that they did not).  *Id.* at PG&E0739.  Long term recommendations included replacing other equipment that may have contributed to the outage, as well as upgrading electromechanical relays to microprocessor-based relays to allow for better "event capturing capabilities" for diagnosis of any future issues.  *Id.* at PG&E0740.

According to later deposition testimony by Jonathan Sykes, PG&E's person-most-knowledgeable under Rule 30(b)(6), the Root Cause analysis was limited to understanding why PG&E's two circuit breakers tripped—isolating the Substation and its clients from PG&E's power grid and generators—and did not address why FWM's Cogen tripped offline after the outage.  Sias Decl. Ex. 26 (Sykes Dep.) 70:12−71:11.  According to Sykes, that issue "would be a part of a different root cause analysis.  It would be part of Foster Wheeler's root cause analysis."  *Id.* 73:15−17.  A PG&E engineer testified similarly, attributing PG&E's focus on the substation outage to the parties' agreement that each was in the best position to evaluate its own systems.

1    *See* Sias Decl. Ex. 18 (Nie Dep.) 77:10−78:25.

2           **3.   November 17, 2014: Load at Risk Notification**

3           PG&E's first document production on November 17, 2014 included a Load at Risk

4    Notification prepared by PG&E engineer Sebastian Fiala several months before the power outage.

5    *See* de Recat Decl. ¶ 5 & Exs. C1, C2.  That document includes the following assessment of the

6    likely outcome of a failure on the remaining transmission line to the Substation during

7    maintenance of the other transmission line:

8                   Tidewater Banks #1 and #2 and Foster Wheeler are out of service or
                    islanded. Under/over voltage and under/over frequency can result.
9                   *The majority of the time, load at Tidewater will exceed generation at
                    Foster Wheeler, and will likely cause Foster Wheeler units to trip
10                  offline.*  If an islanding condition occurs and voltages/frequency can
                    be brought to tolerable levels, bring back Pittsburg CB 612 and
11                  synchronize with island.

12   *Id.* Ex. C1 at PG&E0873 (emphasis added).

13                                              * * *

14          All of the information discussed above was disclosed to PG&E before the stipulated

15   amendment deadline.  The following information was disclosed after the deadline.

16          **4.   January 30, 2015: Documents from 1986**

17          PG&E's document production on January 30, 2015 included a number of documents

18   related to discussions between PG&E and FWM[7] in 1986.  Memoranda exchanged between the

19   two companies indicate that PG&E required FWM to disclose the interconnection equipment and

20   settings used to connect the Cogen to the PG&E grid, and that FWM did so.  De Recat Decl. Ex.

21   D.  FWM's notes from a meeting on September 23, 1986 state that PG&E's interconnection

22   requirements exceeded the limits of FWM's steam turbine generator.  *Id* Ex. E.  However,

23   historical data from PG&E's system "show[ed] that the limits for continuous operation for the

24   steam turbine have never been exceeded" in the past ten years, and the system only approached the

25   lower frequency limit once.  *Id.*  Further, "PG&E's 'Load Shedding and Tie Tripping Schedule'

26   indicate[d] that all interruptible customers and 50% of the remaining load will be shed

27   ───────────────

28          [7] These documents actually relate to FWM's predecessor, Foster Wheeler USA Corporation,
     a/k/a FWUSA.  For simplicity, however, this Order refers to FWUSA as FWM.

United States District Court
Northern District of California

1   automatically and also the tie lines will be tripped before the turbine reaches the lower limit for

2   continuous operation." *Id.* PG&E stated that it would advise its "legal department to adjust the

3   capacity credit clause of the 'Power Purchase Agreement' to reflect the lower available capacity"

4   if FWM operated the Cogen "with relay settings other than those specified" by PG&E. *Id.*

5       There is some question as to when Tesoro first had access to these documents. PG&E

6   notes that Tesoro entered a "common interest agreement" with FWM on July 21, 2014, and asserts

7   that Tesoro therefore had access to the 1986 documents at that time. Opp'n (dkt. 82) at 8 n.8

8   (citing Sias Decl. Ex. 33 ¶ 1). Tesoro's Reply does not address this assertion, but the Court is not

9   aware of any evidence that FWM actually retained these documents, which were created by its

10  predecessor nearly thirty years before FWM and Tesoro entered their common interest agreement.

### 5.   February 25, 2015: Deposition of Ben Nie

12      Ben Nie, a PG&E engineer, testified on February 25, 2015 that the erroneous operation of

13  the synch switches was, in his view, the most likely cause of Substation outage, and that it was the

14  only concrete possible cause that PG&E identified. De Recat Decl. Ex. G (Nie Dep.) 63:7−64:6,

15  68:9−25. However, according to Nie, PG&E could not determine with certainty whether the

16  switches caused the outage. Sias Decl. Ex. 18 (Nie Dep.) 58:25−59:8 ("[T]here was a lot of kind

17  of chicken and egg sequence that we couldn't determine because we had the failed potential

18  devices. . . . I don't think we were able to come to a conclusion."). Even at the time of his

19  deposition, Nie testified that "nothing has really changed in three or fear years" since the outage

20  with respect to his assessment of the cause, and he "still wouldn't today . . . say for sure, yeah, that

21  resulted and, you know, A led to B." *Id.* 60:20−61:2. He noted that although he personally

22  believed that there was a greater than fifty percent chance that the synch switches caused the

23  outage, there was a significant gap between the outage and the time when PG&E believed the

24  switches could have been last adjusted, and that programmable logic controllers that failed during

25  the outage—likely as a result of the synch switches—had also been known to fail spontaneously.

26  *Id.* 59:22−60:3, 62:22−63:4, 63:14−21.

### 6.   March 16, 2015: Deposition of Richard White

28      Richard White, who participated in an inspection of the Substation sometime in 2010

before the outage, testified on March 16, 2015 that at the time of the inspection, he informed "the team that was involved" that the synch switches did not have a mechanical interlock feature. De Recat Reply Decl. (dkt. 92) Ex. O (White Dep.) 41:9−25. He also testified that the lack of that feature was a "fairly" serious design defect, and that he did not recall discussing the urgency of remedying the defect. *Id.* 54:1−8, 56:22−57:1.

### 7.   March 17, 2015: Deposition of Sebastian Fiala

On March 17, 2015, Sebastian Fiala testified that he laid out the scenario of the Cogen tripping offline in his Load at Risk Notification "so the system operators and system dispatchers would know that this condition could exist and it could occur, just so they would be privy to the scenario and they would be able to prepare themselves and know what to do next." De Recat Decl. Ex. I (Fiala Dep.) 92:4−8.

### 8.   March 18, 2015: Deposition of Frank Eich

On March 18, 2015, Tesoro's counsel asked Frank Eich, a PG&E customer account representative responsible for the FWM and Tesoro accounts, about the scope of PG&E's responsibility to its customers and the effects of an "islanding" scenario. De Recat Decl. Ex. J (Eich Dep.) 52:12−54:20, 86:10−87:8. Eich testified that PG&E "service[s] each customer at a service point. You can put your finger on it. That's where PG&E's responsibility terminates, and beyond that, how it's wired, how it's connected, what it's used for and stuff, is the customer's responsibility." *Id.* 53:9−13. Except in special circumstances not applicable to the Cogen and the Refinery, "PG&E has no ability to serve beyond the point of termination." *Id.* 87:5−8. Eich stated that he did not know "exactly what happens when either a gen[erator] goes off or PG&E goes off at that service point," because he "didn't design the load shedding or failsafe or contingencies at the service." *Id.* 52:24−53:2.

Discussing his own job responsibilities and understanding, Eich testified that he "ha[d] no idea" whether other customers' load could be shed if a loss of power to the Substation resulted in an "islanding scenario," and that he "ha[d] no need to even care about that." *Id.* 54:8−17.

### 9.   May 1, 2015: PG&E Interconnection Handbook

Tesoro cites PG&E's May 1, 2015 production of its "interconnection handbook which sets

forth PG&E policy and procedures regarding protective equipment for its electrical systems" as among the purportedly delinquent productions justifying Tesoro's delayed motion for leave to amend, but does not provide that document or explain whether or how it would support a claim for punitive damages.  Mot. (dkt. 69) at 17 (citing de Recat Decl. ¶ 9).

### 10. May 28, 2015: Deposition of Brian Cawaring

Brian Cawaring, who supervised PG&E's Grid Control Center, testified on May 28, 2015 that a transmission line to the Substation tripping offline would cause a visual and auditory alarm to go off in the control room.  De Recat Decl. Ex. K (Cawaring Dep.) 47:21−48:2.  He also testified that control center operators received load risk analysis notifications—like Sebastian Fiala's notification that, as discussed above, warned that an outage would create an "island" and likely cause the Cogen to trip offline.  *Id.* 159:19−162:17.  Further, Cawaring testified that no one interviewed him during PG&E's investigation of the outage.  *Id.* 54:4−15.  He stated that he was not part of the investigation team.  *Id.* 53:21−24.

### 11. June 3, 2015: Deposition of Michael Van Remoortere

On June 3, 2015, Michael Van Remoortere, a PG&E engineer and Rule 30(b)(6) corporate witness, testified that he also received Sebastian Fiala's Load at Risk Notification—which, as discussed above, warned that an outage would create an "island" and likely cause the Cogen to trip offline—and that it was "sent to a fairly wide audience."  De Recat Reply Decl. ¶ 6 & Ex. R (Van Remoortere Dep.) 20:2−15.  He further testified that he saw no evidence that PG&E took any action in response to Fiala's identification of that contingency.  De Recat Decl. Ex. L (Van Remoortere Dep.) 89:24−90:4.

### 12. July 20, 2015: Deposition of Feliks Karchemskiy

On July 20, 2015, Tesoro's counsel asked Feliks Karchemskiy, a PG&E senior protection engineer who participated in the investigation of the 2010 outage, whether "having those synch switches without the . . . keyed or locked faceplate is a serious violation of PG&E's standard design."  De Recat Reply Decl. Ex. S (Karchemskiy Dep.) 18:11−14.  Karchemskiy responded as follows:

United States District Court
Northern District of California

11

United States District Court
Northern District of California

> I would say this: It's definitely a conceptual violation of the good engineering practice that I would define as -- and it's ABC of engineering that potential devices should not be paralleled on the low side.
>
> And that could be achieved by a number of approaches. It could be done by interlock keys, but it could be done by procedure. You know, if personnel knows that those switches should not be left in the on position simultaneously, and that they should not parallel the potential devices on the low side, that would be acceptable.

*Id.* 18:19−19:5.  Karchemskiy also wrote in an email, which Tesoro apparently obtained at some point before the deposition, that the lack of an interlock feature for the faceplates was a serious violation of PG&E's design standards.  De Recat Decl. Ex. M (Karchemskiy Dep.) 26:14−21.

In response to a question about whether PG&E's root cause investigation covered the Grid Control Center's failure to respond to an alarm, Karchemskiy testified that his role was "related to the scheme and equipment," that he did not "believe in my part of the job we investigated any human performance," and that "Grid control does their own thing" and would likely conduct their own investigation.  *Id.* 63:14−64:6.  Karchemskiy testified that he had no knowledge of why the control operator failed to respond to the alarm for fifty minutes.  *Id.* 64:11−65:5.

### D.   Parties' Arguments

#### 1.   Tesoro's Motion

Tesoro argues that the stipulated January 18, 2015 deadline should be set aside because enforcing it, and thus rejecting Tesoro's request to amend the complaint after that deadline, would constitute "manifest injustice."  Mot. at 16 (quoting *United States v. Barrueta*, No. CR-94-20050-JW, 1996 WL 101197, at *1 (N.D. Cal. Feb. 29, 1996)).  According to Tesoro, "PG&E repeatedly delayed producing key documents that were relevant to Tesoro's evaluation of whether to reassert its claim for punitive damages," producing relevant documents "close to and mostly *after* the amendment cut-off date to which the parties stipulated."  *Id.* at 16−17.  In a footnote, Tesoro acknowledges that it too completed its document production "well beyond the original response date," and that PG&E's delay may have been "unavoidable."  *Id.* at 17 n.3.

Tesoro also contends that "PG&E attempted to conceal their conscious disregard for the rights and safety of Tesoro" by omitting certain conduct from PG&E's Root Cause Analysis.  *Id.* at 17.  According to Tesoro, the 2011 Root Cause Analysis omits the following "key facts":

(1) negligent design and operation of the synch switches was "the *most likely* identified cause of the power outage"; (2) PG&E personnel failed to adequately respond to failure alarms twice during the period leading up to the outage, when PG&E could have warned FWM of the risk; and (3) PG&E had previously prepared a Load at Risk Notification recognizing the likelihood that a power failure at the Substation would overload the Cogen.  Mot. at 9.  Tesoro argues that as a result, it did not learn these facts "until [the completion of] extensive discovery which PG&E routinely delayed."  *Id.* at 17−18.

Tesoro asserts that "punitive damages are warranted here due to [PG&E's] malicious conduct."  *Id.* at 18.  Tesoro claims that PG&E displayed "conscious disregard of the rights or safety of others," which can support a claim for punitive damages under California law.  *Id.* at 13 (quoting Cal. Civ. Code § 3294; *SKF Farms v. Superior Court*, 153 Cal. App. 3d 902, 907 (1984)).  Specifically, Tesoro cites the documents from 1986 as evidence that PG&E assured FWM that PG&E's safeguards would protect the Cogen from excess load, and Sebastian Fiala's 2010 Load at Risk Notification as evidence that PG&E knew that a failure of its own transmission lines would likely overload the Cogen.  *Id.* at 14−15.  According to Tesoro, PG&E's failure to either take steps to prevent that outcome or warn Tesoro and FWM of the risk "constitutes a knowing disregard of the rights and safety of Tesoro."  *Id.* at 15−16.

Tesoro also argues that granting its Motion would not prejudice PG&E, *id.* at 18, because "Tesoro is merely re-asserting a previously pleaded claim for punitive and exemplary damages," and PG&E has therefore "been on notice from the onset of this litigation that Tesoro may renew its claim for punitive damages."  *Id.* at 21 (emphasis omitted).  Further, according to Tesoro, evidence related to punitive damages "falls within PG&E's purview" and the proposed amendment thus would not require further discovery by PG&E.  *Id.* at 21−22.

In addition to claiming manifest injustice, Tesoro argues that leave to amend should be granted under the liberal standard applicable to Rule 15 of the Federal Rules of Civil Procedure. *See id.* at 19−22.  Because as discussed below the Court holds that Tesoro failed to show manifest injustice sufficient to set aside its stipulation, or good cause sufficient to alter a scheduling order under Rule 16, the Court does not reach Tesoro's Rule 15 arguments.

United States District Court
Northern District of California

### 2.   PG&E's Opposition

PG&E argues that Tesoro has not shown manifest injustice and thus should not be relieved of its commitment under the parties' stipulation.  *See* Opp'n at 10.  PG&E asserts that it shared relevant information with Tesoro in the aftermath of the outage and prepared a comprehensive Root Cause Analysis, although the Root Cause Analysis focused on the reasons the Substation became disconnected from the grid, not the reasons FWM's Cogen went offline after the Substation outage.  *Id.* at 11−12 & n.11.  Even if Tesoro did not have all the information on which it now relies before the amendment deadline, PG&E contends that Tesoro had "all of the 'key' evidence on which its motion is based by March 2015 at the latest," several months before Tesoro filed its present Motion.  *Id.* at 16.  According to PG&E, its own document production was diligent and in line with the parties' agreements, while "Tesoro failed to pursue discovery in a diligent way" and did not produce any of its own documents until months after PG&E's first production.  *Id.* at 12−13.  PG&E contends that Tesoro bears responsibility for postponing the depositions that occurred after the close of discovery, and that the information Tesoro claims to have obtained during those depositions is largely redundant to information PG&E provided before litigation began.  *Id.* at 13−14.

According to PG&E, "[t]hat Tesoro may have belatedly realized it erred in not pursuing punitive damages is not grounds for relief."  *Id.* at 14 (citing, *e.g.*, *Morrison v. Zangpo*, No. C-08-1945 EMC, 2008 WL 4449585, at *4 (N.D. Cal. 2008)).  PG&E claims that it would be prejudiced by allowing Tesoro to amend after the close of both fact and expert discovery, because "Tesoro has presumably conducted discovery with punitive damages in mind," while "PG&E had the right to—and did—rely on Tesoro's election not to reassert a punitive damages claim" by the agreed deadline.  *Id.* at 18−20.  Finally, PG&E argues that the Motion should be denied because, according to PG&E, Tesoro's evidence and proposed pleading are insufficient to support such damages.  *Id.* at 21−24.

### 3.   Tesoro's Reply

Tesoro begins its Reply by reviewing facts that, according to Tesoro, demonstrate that PG&E "acted with willful and knowing disregard of the rights and safety of Tesoro, FWM, and

United States District Court
Northern District of California

1    the [local] residents," and that—according to Tesoro—"PG&E does not dispute."  Reply (dkt. 91)

2    at 2–5 (emphasis omitted).  Tesoro also argues that PG&E overstates the extent of its disclosures

3    to Tesoro after the outage.  *Id.* at 5–9.  Addressing the "manifest injustice" standard, Tesoro

4    argues that it "did not learn the full extent of PG&E's omissions until the production of key

5    documents and the depositions of PG&E's witnesses," and goes on to recount depositions that it

6    took from March 16 through July 20, 2015.  *Id.* at 9–10 (capitalization altered).  Tesoro contends

7    that enforcing the stipulation would "reward[] PG&E for its delay tactics" and would not cause

8    prejudice because the facts at issue are either "directly related to Tesoro's original cause of action"

9    or within PG&E's own knowledge.  *Id.* at 11–12, 15.  Tesoro also asserts that its Motion was

10   promptly filed because it came within weeks of the final deposition of a fact witness (Feliks

11   Karchemskiy) and before, albeit only *days* before, PG&E moved for partial summary judgment.

12   *Id.* at 13–14.  Tesoro disputes PG&E's contention that the proposed amendment would be futile.

13   *Id.* at 14–15.

14   **III.    ANALYSIS**

15       **A.    Legal Standard**

16        In general, when a party seeks to amend a pleading more than 21 days after serving it, or

17   more than 21 days after service of a responsive pleading or motion, the party must obtain either

18   the opposing party's consent or leave of the court.  Fed. R. Civ. P. 15(a).  The Federal Rules of

19   Civil Procedure provide that "courts should freely give leave when justice so requires."  *Id.*

20   "Courts may decline to grant leave to amend only if there is strong evidence of 'undue delay, bad

21   faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by

22   amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of

23   the amendment, [or] futility of amendment, etc.'"  *Sonoma Cty. Ass'n of Retired Emps. v. Sonoma

24   County*, 708 F.3d 1109, 1117 (9th Cir. 2013) (quoting *Foman v. Davis,* 371 U.S. 178, 182 (1962))

25   (alteration in original).

26        The stipulation in this case, however, changes the calculus.  "[U]nder Ninth Circuit law, a

27   stipulation may . . . be withdrawn to prevent a manifest injustice."  *Morrison v. Zangpo*, No.

28   C-08-1945 EMC, 2008 WL 4449585, at *3 (N.D. Cal. 2008) (citing *Waggoner v. Dallaire*, 767

United States District Court
Northern District of California

F.2d 589, 593 (9th Cir. 1985)).[8]  "In determining what constitutes manifest injustice, courts may consider (1) the effect of the stipulation on the party seeking to withdraw the stipulation; (2) the effect on the other parties to the litigation; (3) the occurrence of intervening events since the parties agreed to the stipulation; and (4) whether the evidence contrary to the [stipulation] is substantial."  *Id.* at *4 (quoting *State Farm Fire & Cas. v. McDevitt*, No. C-00-2240 EDL, 2001 WL 637419, at *8 (N.D. Cal. 2001)) (alteration in original).  Here, where the parties' stipulation was procedural rather than factual, the Court finds the fourth factor inapplicable.

### B.    Effect on Tesoro

If the stipulation is enforced, Tesoro would be barred from seeking punitive damages, because it failed to amend its complaint by the stipulated deadline.  Tesoro could continue to prosecute its case and, if successful, recover damages equivalent to any compensable harm that it actually suffered.

### C.    Effect on PG&E

If the stipulation is enforced, PG&E will not be liable for punitive damages, because Tesoro did not amend its complaint to seek such damages by the stipulated deadline.  PG&E may still be liable for any compensable harm that Tesoro actually suffered.

If the stipulation is set aside, and assuming that the Court finds the proposed amendment permissible under Rules 15 and 16, PG&E could be liable for punitive damages.  PG&E would almost certainly file a motion for summary judgment as to Tesoro's punitive damage claim (or seek leave to submit supplemental briefing regarding that issue to be addressed with its currently pending summary judgment motion), and the Court would either continue the October 16, 2015 hearing date or hold a second summary judgment hearing to address punitive damages.[9]  *See* Opp'n at 21–25 (arguing that the proposed punitive damages claim would not survive a motion for

---

[8] The *Morrison* decision also discusses the possibility that "relief from a stipulation may be given where a party enters a stipulation due to mistake, inadvertence, or excusable neglect." *Morrison*, 2008 WL 4449585, at *3.  No party argues that the stipulation in this case was the result of mistake, inadvertence, or excusable neglect.

[9] Tesoro filed its present Motion nine days before the deadline to file dispositive motions. PG&E filed a Motion for Partial Summary Judgment (dkt. 78) on that deadline, which is now fully briefed and set for an October 16, 2015 hearing.

1  summary judgment).  At a case management conference on August 10, 2015, PG&E stated its

2  intent to seek summary judgment on the issue of punitive damages if Tesoro prevailed on the

3  present Motion, and the Court determined that it would allow PG&E to do so.  *See* dkt. 72 (text-

4  only minute entry).

5      PG&E also argues that it would require additional discovery if Tesoro is permitted to

6  pursue a claim for punitive damages.  Opp'n at 20.  Although Tesoro now contends that no such

7  discovery is needed, it initially agreed to the amendment deadline specifically to allow PG&E time

8  to conduct discovery if Tesoro reasserted a claim for punitive damages.  *See* Edelstein Decl. Ex. 1

9  (email exchange between counsel for Tesoro and PG&E).

10      **D.    Intervening Events**

11      The third and, in this case, final factor is "the occurrence of intervening events since the

12  parties agreed to the stipulation."  *Morrison*, 2008 WL 4449585, at *4 (citation omitted).  If there

13  have been no significant intervening events, an attorney's mere "realization that he may have

14  made a tactical error . . . does not render enforcement of the stipulation a manifest injustice."  *Id.*

15  Although by its terms this factor encompasses all discovery in this case, the possibility that Tesoro

16  would discover grounds to seek punitive damages *before* the stipulated amendment deadline was

17  plainly anticipated by the stipulation.  In the Court's view, relevant intervening events include any

18  information discovered after the deadline for amendment, as well as both parties' conduct, before

19  and after the deadline, that either facilitated or inhibited Tesoro's ability to seek a timely

20  amendment.

21      **1.    Discovery of Relevant Facts**

22      Tesoro argues that:

23          it was not until extensive discovery which PG&E routinely delayed
            that Tesoro learned that the *only* identified cause of the power
24          outage was PG&E's negligent design and operation of its synch
            switches, that GCC operators failed to timely respond to multiple
25          alarms warning of an electrical system failure, and that PG&E
            configured its electrical system so that its North Concord customers
26          would draw electrical power from FWM's Cogen in the event of a
            power outage at Tidewater, even though PG&E was aware that
27          (1) the Cogen could not bear the additional load of North Concord,
            (2) such a configuration would force a power outage at the Cogen,
28          and subsequently the Refinery, and (3) the PG&E load shedding

United States District Court
Northern District of California

system that would prevent a power outage at the Cogen was not operational or connected.

Mot. at 17−18.  In fact, Tesoro learned all of the above before the stipulated deadline to amend its complaint.

The PG&E Root Cause Analysis—which Tesoro received well before this litigation commenced—identified "[t]he synch switches for CB212 & 213 both being in the ON position" as "an abnormal switching condition," the impact of which "may range from minimal impact to damaged secondary potential circuits and equipment."  De Recat Decl. Ex. B at PG&E0737. Consistent with Ben Nie's later testimony, the Root Cause Analysis reports that "it is . . . impossible to determine what damage, if any . . . was caused by the incorrect operation of the synch switch."  *Id.*  However, the Root Cause Analysis did identify the synch switches as a possible cause of damage, and did not identify any other possible root cause.  Tesoro therefore had reason to believe that "that the *only* identified [possible[10]] cause of the power outage was PG&E's negligent design and operation of its synch switches," *see* Mot. at 17−18, long before the amendment deadline.[11]

Tesoro also learned before the start of this litigation that "that GCC operators failed to timely respond to multiple alarms warning of an electrical system failure."  *See* Mot. at 18.  In January of 2011, "Tesoro concluded from PG&E's review of the records that there was no awareness within PG&E during the 50 minute window from 1509," when a circuit breaker was opened but an alarm was not acknowledged, "through 1559 that Tidewater Substation was in a vulnerable position, and that there was no action taken regarding Tidewater until at least after the 1559 [second circuit] breaker open."  Sias Decl. Ex. 29 (Tesoro internal email).  Subsequent deposition testimony that the alarm was both auditory and visual and that a supervisor was not

---

[10] The record before the Court indicates that to date, PG&E has not identified the synch switches as the definitive cause of the outage.  *See* Sias Decl. Ex. 18 (Nie Dep.) 58:25−59:8, 60:20−61:2.

[11] Tesoro's own Root Cause Analysis, dated August 11, 2011, lists four root causes.  Sias Decl. Ex. 17 at 5.  Tesoro's "Root Cause #1" is the faulty operation and design of the synch switches.  The second and third identified causes discuss damaged equipment, which based on PG&E's Root Cause Analysis may or may not have been caused by the synch switch error. Tesoro's fourth root cause discusses the lack of a system to separate the Cogen from the Substation in the event the Substation loses power, which is likely a contributing cause of the Cogen outage but is not a cause of the Substation outage.

United States District Court
Northern District of California

1    sure why there was no response, *see* de Recat Decl. Ex. K (Cawaring Dep.) 47:21−48:2, does not

2    significantly add to the core facts that Tesoro learned several years before the deadline for

3    amendment.

4           Finally, Tesoro learned no later than November of 2014—approximately three months

5    before the amendment deadline—that PG&E was aware of the risk of tripping the Cogen offline if

6    the Substation became isolated from PG&E's grid, because Sebastian Fiala's Load at Risk

7    Notification predicting exactly that result was included in PG&E's first production of documents.

8    *See* de Recat Decl. ¶ 5 & Exs. C1, C2.  Fiala's prediction implicitly but necessarily acknowledged

9    that: (1) "the Cogen could not bear the additional load of North Concord," (2) an "islanding"

10   scenario "would force a power outage at the Cogen, and subsequently the Refinery," and (3) there

11   was no "load shedding system that would prevent a power outage at the Cogen," *see* Mot. at 18,

12   because if any of those things were *not* true, "load at Tidewater" would not "cause Foster Wheeler

13   units to trip offline" as Fiala predicted.  *See* de Recat Decl. Ex. C1 at PG&E0873.

14          Although subsequent discovery revealed the extent of that notification's distribution within

15   PG&E, the notification itself is the key document to any theory of recovery based on PG&E's

16   knowledge of risk, because it put Tesoro on notice that at least some PG&E employees were

17   aware that an outage at the Substation would cause the Cogen to trip offline.  Even if the Load at

18   Risk Notification did not in itself provide a sufficient basis for Tesoro to reassert a claim for

19   punitive damages—an issue that the Court need not decide—at the very least, it should have

20   prompted Tesoro to pursue that lead in the months remaining before the deadline, or to seek an

21   extension of the deadline to allow more time to do so.

22          There are a small number of potentially relevant facts that Tesoro may have actually

23   learned after the amendment deadline.  Tesoro emphasizes the 1986 documents, which it asserts

24   demonstrate that PG&E required FWM to use dangerous interconnection settings based on

25   promised PG&E protective measures that were not in place at the time of the 2010 outage.  *See*

26   Mot. at 5−6.  PG&E disputes the meaning of those documents, arguing that the protective

27   measures at issue pertained to disruptions to the grid a whole, and that the documents do not

28

United States District Court
Northern District of California

1  "address or even mention an islanded condition at Tidewater [Substation]."  Opp'n at 24.[12]  Even

2  accepting Tesoro's view of the documents, however, and even assuming that Tesoro did not have

3  prior access to them through its common interest agreement with FWM, PG&E produced these

4  documents on January 30, 2015.  A motion to amend the complaint in the weeks following that

5  disclosure, within a month or two of the stipulated deadline and while discovery was still ongoing,

6  would have presented a very different scenario than Tesoro's present Motion—filed more than *six*

7  *months* after both the stipulated deadline and the production of the 1986 documents.  Further,

8  Tesoro relies on these documents in large part to show that "PG&E was fully aware of FWM's

9  protective relay settings," Reply at 2 n.1, which is redundant to PG&E's knowledge, as

10  demonstrated in Fiala's previously-disclosed Load at Risk Notification, that a "island" situation

11  would likely cause the Cogen to go offline.

12          The second potentially relevant fact that may have been revealed after the amendment

13  deadline is that PG&E discovered the synch switches' defective lack of an interlock feature before

14  the outage, during an inspection.  *See* Reply at 9 (citing de Recat Reply Decl. Ex. O (White Dep.)

15  41:20−25).  Although Tesoro cites Richard White's March 16, 2015 deposition as the source of

16  this information, Tesoro's counsel appears to have already known about it at that time, and the

17  record before the Court does not indicate when it was actually disclosed.  *See* White Dep.

18  41:20−23 ("Q. BY MR. BEGLAND: Am I correct that at that walk-down, you told the team that

19  was involved that some of the synch switches at the substation lacked the mechanical interlock

20  feature?").  Even if this fact was first revealed at the deposition, which appears unlikely, that was

21  still nearly five months before Tesoro filed its present Motion and first indicated that it would

22  pursue a claim for punitive damages.  Finally, Tesoro did not address this issue in its Motion,

23  instead raising it for the first time in its Reply, and courts "ordinarily decline to consider

24

25

26  [12] The nature of PG&E's pressure on FWM is also not clear from the face of the documents,
which indicate that PG&E would "adjust the capacity credit clause of the 'Power Purchase

27  Agreement' to reflect the lower capacity" if FWM did not use PG&E's preferred relay settings.
De Recat Decl. Ex. D.  If FWM's proposed alternative settings would in fact have reduced

28  capacity, that may have been a perfectly reasonable response, rather than the "threat" that Tesoro
now characterizes it as.  *See* Mot. at 6.

United States District Court
Northern District of California

arguments raised for the first time in a reply brief." *United States v. Bohn*, 956 F.2d 208, 209 (9th Cir. 1992).

As outlined above in the "Background" section of this Order, the remaining information revealed after the stipulated amendment deadline largely consisted of mere context to the key facts discussed above. For example, the excerpts that Tesoro provides of Feliks Karchemskiy's July 20 deposition—on which Tesoro relies heavily for the purported timeliness of its Motion, as he was the last fact witness deposed—reveal only that allowing multiple synch switches to be on at the same time is a "violation of the good engineering practice" and a serious violation of PG&E's standards, and that Karchemskiy was not aware of what occurred at the Grid Control Center or any investigation thereof, despite his being part of the team that prepared the Root Cause Analysis. De Recat Decl. Ex. M (Karchemskiy Dep.) 26:14−21, 62:17−65:50; de Recat Reply Decl. Ex. S (Karchemskiy Dep.) 18:11−23. The information about the synch switches echoes the 2011 Root Cause Analysis, which plainly identified the switches' inconsistency with PG&E standards and the need to bring them into compliance.[13] *See* de Recat Decl. Ex. B at PG&E0732, 0736, 0740. Karchemskiy's lack of knowledge about the Grid Control Center response similarly proves very little beyond what Tesoro knew years before—that Grid Control Center operators failed to respond to an alarm, and that the Root Cause Analysis omitted that issue. *See generally id.*; Sias Decl. Ex. 29. Based on the record available, it is difficult to understand how Karchemskiy's deposition contributed in any way to Tesoro's analysis of whether it could reassert a claim for punitive damages.

### 2. Parties' Conduct During Discovery

After asserting that "PG&E repeatedly delayed producing key documents that were relevant to Tesoro's evaluation of whether to reassert its claim for punitive damages," Tesoro's Motion includes the following footnote, printed in text too small to comply with this Court's Local

---

[13] Further, Karchemskiy originally characterized the defect as serious in an email that Tesoro's counsel already had at the time of the deposition. *See* de Recat Decl. Ex. M (Karchemskiy Dep.) 26:14−21. At the deposition, the attorney recounted the email and asked Karchemskiy to confirm that he had written it, and Karchemskiy agreed that he had. *Id.* It is not clear from the record when Tesoro obtained that email.

1    Rules:[14] "In fairness, Tesoro also needed additional time producing documents well beyond the

2    original response date and both sides engaged in rolling productions; but whether PG&E's delay

3    was strategic or unavoidable, it shouldn't be used as an excuse to prejudice Tesoro in bringing this

4    motion." Mot. at 16–17 & n.3.

5    Tesoro fails to acknowledge its own role in the discovery process. Tesoro entered a

6    stipulation that explicitly required it to reassert its punitive damages claim well before the close of

7    discovery. That arrangement presents an inherent risk that relevant information could arise after

8    the amendment deadline. Accordingly, Tesoro was on notice of the urgency of procuring relevant

9    discovery.

10   If Tesoro believed that PG&E was not acting diligently, Tesoro had numerous options

11   available: it could have moved to compel production, prospectively asked the Court to extend the

12   stipulated amendment deadline, or, in an extreme case, sought discovery sanctions. Before taking

13   any of those steps, however, Tesoro could and should have conferred with PG&E to express its

14   concern about the production schedule and request that PG&E either complete relevant discovery

15   before the amendment deadline or stipulate to continue that deadline until relevant documents

16   were disclosed and Tesoro had an opportunity to depose witnesses on the subject. Undisputed

17   evidence in the record indicates that Tesoro did none of those things, and in fact never raised

18   concerns about PG&E's document production schedule before the deadline for amendment, nor

19   suggested revisiting the stipulation until it filed the present Motion. Edelstein Decl. ¶¶ 21–22;

20   Sias Decl. ¶¶ 24–25. Instead, Tesoro (1) agreed to a rolling production of documents; (2) agreed

21   that the parties would "attempt to make an initial production of documents in advance of the

22   mediation" occurring about a month before the amendment deadline; (3) failed to meet that

23   deadline; and (4) made a minimal first production on January 9, 2015, six months after PG&E

24   served its first requests for production. *See* Sias Decl. ¶¶ 10, 12, 18, 21, 23.

25   Later, when PG&E suggested extending the fact discovery period—which would have

26   retroactively extended the amendment deadline—Tesoro refused. Edelstein Decl. ¶ 24. Also after

27

28   ────────────────
     [14] *See* Civ. L.R. 3-4(c)(2).

United States District Court
Northern District of California

1   the deadline passed, scheduling conflicts by both Tesoro's counsel and PG&E's witnesses led to

2   delays in completing their depositions, but Tesoro's counsel stated that he did not object to taking

3   a witness's deposition any time before trial.  *Id.* ¶¶ 25−28. In short, Tesoro made no significant

4   effort to ensure that either PG&E's or its own document productions, much less depositions, were

5   completed before the stipulated deadline for amendment, and there is no indication that PG&E

6   deviated in any way from the parties' various agreements regarding the timeline for discovery or

7   intentionally delayed the production of relevant information.

8        **E.    Enforcing the Stipulation Does Not Result in Manifest Injustice**

9        The question of when a denial of punitive damages rises to the level of manifest injustice is

10   somewhat complex.  "Punitive damages by definition are not intended to compensate the injured

11   party, but rather to punish the tortfeasor whose wrongful action was intentional or malicious, and

12   to deter him and others from similar extreme conduct."  *City of Newport v. Fact Concerts, Inc.*,

13   453 U.S. 247, 266−67 (1981) (considering the propriety of punitive damages against a

14   municipality).  "Indeed, punitive damages . . . are in effect a windfall to a fully compensated

15   plaintiff . . . ."  *Id.* at 267; *see also Hawkins v. United States*, 30 F.3d 1077, 1084 (9th Cir. 1994)

16   (noting in the context of tax exemption that punitive damages "bear no relationship to actual

17   injuries, do not even purport to compensate the victim for actual losses, and cannot rationally be

18   characterized as anything but a windfall").  As such, it is difficult to imagine any manifest

19   injustice *to a plaintiff* resulting from a denial of punitive damages; the inquiry here turns primarily

20   on whether it would be manifestly unjust for PG&E to escape punitive damages.

21        At least two hypothetical scenarios, one procedural and one substantive, would likely

22   constitute manifest injustice sufficient to set aside the stipulated deadline for amendment: (1) if

23   PG&E withheld relevant information in bad faith for the purpose of avoiding punitive damages by

24   preventing Tesoro from meeting the amendment deadline; or (2) if the evidentiary basis for

25   amendment demonstrated conduct so wantonly malicious that allowing PG&E to escape punitive

26   damages would be manifestly unjust regardless of why Tesoro failed to meet the deadline, based

27   on society's interest in punishment and deterrence of "extreme conduct."  *See City of Newport*,

28   453 U.S. at 266−67.  Perhaps there would also be manifest injustice in enforcing the stipulation if

United States District Court
Northern District of California

23

United States District Court
Northern District of California

Tesoro had worked diligently to expedite discovery and ensure that it received all relevant information before the amendment deadline, but nevertheless obtained relevant information later through circumstances beyond its control, and sought to amend promptly thereafter—although this last scenario turns more on Tesoro's conduct than PG&E's, which runs counter to the tortfeasor-focused purpose of punitive damages.[15]

The record here does not demonstrate any such injustice—even if Tesoro had not already obtained most of the key facts it now relies on before the deadline for amendment. As discussed above, Tesoro made no significant effort to complete relevant discovery before the amendment deadline, and waited until virtually the last possible opportunity to file its present Motion. Tesoro has also presented no evidence of bad faith by PG&E. Finally, even assuming for the sake of argument that the record as a whole would support an award of punitive damages, it is based at most on a reckless failure to take adequate precautions to prevent a power outage. There is no evidence that PG&E actually sought to harm Tesoro or anyone else, or that PG&E knew of and disregarded a risk of anything more than economic harm.[16] The Court finds that if there is any injustice in PG&E avoiding punitive damages, it is outweighed by the disruption of this case that would result from allowing amendment at this late stage.

### F.     Tesoro Has Not Demonstrated Good Cause to Modify a Scheduling Order

Both parties fail to meaningfully address the fact that because the Court adopted the stipulated deadline as "so ordered," *see* dkt. 27, it was not only a stipulation, but also a scheduling order. Rule 16 of the Federal Rules of Civil Procedure provides that scheduling orders "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). The Ninth Circuit has established a standard for such modification that focuses on the diligence of the party

---

[15] A fairly extreme alternative, which Tesoro does not appear to endorse in its briefs, is that declining to allow a plaintiff to seek punitive damages any time the record could support such an award is inherently unjust, regardless of the length of or reason for delay in seeking amendment. The Court declines to adopt an approach that would essentially render the parties' stipulation meaningless.

[16] Tesoro asserts that a loss of power at the Refinery could cause bodily harm to Refinery personnel and environmental harm to the surrounding community and that PG&E was aware of such risk, but has not presented evidence that PG&E was aware of any risk beyond a loss of power. *See* Reply at 3.

seeking relief from a deadline:

> Unlike Rule 15(a)'s liberal amendment policy . . . , Rule 16(b)'s "good cause" standard primarily considers the diligence of the party seeking the amendment. The district court may modify the pretrial schedule "if it cannot reasonably be met despite the diligence of the party seeking the extension." Fed. R. Civ. P. 16 advisory committee's notes (1983 amendment). Moreover, carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief. Although the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for seeking modification. If that party was not diligent, the inquiry should end.

*Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992) (citations omitted).

This standard also requires that Tesoro's Motion be denied, independently of the manifest injustice standard discussed above. Tesoro was not diligent in obtaining discovery from PG&E before the deadline, because it agreed to a rolling production process apparently lacking any fixed deadline for production, made no objection to the pace of PG&E's document production before the amendment deadline, failed to notice any depositions before the amendment deadline, delayed depositions due to its counsel's scheduling conflicts, and expressed willingness to take Feliks Karchemskiy's deposition (which it now dubiously argues is crucial to a claim for punitive damages) any time before trial. *See* Edelstein Decl. ¶¶ 13, 21, 25, 27. It was not diligent in its own document production because it did not make its first production—which largely consisted of documents PG&E already had—until January of 2015. Sias Decl. ¶¶ 21, 23. Finally, it was not diligent in moving to amend because it did not do so, or even indicate to PG&E that it might do so, until more than seven months after the stipulated deadline and at least several months after learning the key facts on which it now relies. Because Tesoro "was not diligent, the inquiry should end." *See Johnson*, 975 F.2d at 609.

## IV. CONCLUSION

For the reasons stated above, Tesoro's Motion for Leave to Amend is DENIED. This Order need not and does not address whether Tesoro's proposed amendment would be permissible under Rule 15 if the parties had not stipulated to a deadline and the Court had not adopted that stipulation as an order. The Court also does not reach PG&E's arguments that the evidence

1   presented and the proposed second amended complaint are inadequate to support punitive

2   damages under California law.

3       **IT IS SO ORDERED.**

4   Dated: September 28, 2015

5   _____

6   JOSEPH C. SPERO
    Chief Magistrate Judge

United States District Court
Northern District of California