1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7   TESORO REFINING & MARKETING
    COMPANY LLC,                                Case No.  14-cv-00930-JCS

8                      Plaintiff,

9            v.                                 ORDER DENYING MOTION FOR
                                                PARTIAL SUMMARY JUDGMENT
10  PACIFIC GAS AND ELECTRIC                    Re: Dkt. No. 78
    COMPANY,
11
                       Defendant.
12

13  **I.      INTRODUCTION**

14          This case concerns a power outage at the Golden Eagle Refinery (the "Refinery") owned

15  by Plaintiff Tesoro Refining & Marketing Company LCC ("Tesoro").  Defendant Pacific Gas and

16  Electric Company ("PG&E") moves for summary judgment on Tesoro's negligence and breach of

17  contract claims, arguing that a tariff rule approved by the California Public Utilities Commission

    ("CPUC") absolves PG&E of liability because the incident was a "transmission related outage."

18          The Court held a hearing on October 16, 2015, and on October 20, 2015 issued an order

19  requesting that the CPUC address the scope of the tariff rule.  The CPUC has since responded and

20  offered assistance, but advised that Tesoro would need to file an administrative complaint and the

21  Court would need to stay the case and continue the trial date to allow time for administrative

22  proceedings.  The Court thanks the CPUC for its offer and respects its need for time to address the

23  issue.  However, as no party has requested a stay or continuance, the Court proceeds to resolve the

24  Motion.  For the reasons discussed below, the Court holds that the limitation of liability provision

25  does not apply to the facts of this case (viewed, as they must be in the present context, in the light

26  most favorable to Tesoro) and DENIES PG&E's Motion for Partial Summary Judgment.[1]

27

28  _____

    [1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all

## II.       BACKGROUND

### A.      Factual Background

The following summary recounts the facts as construed in the light most favorable to Tesoro for the purpose of resolving PG&E's present Motion.  This Order should not be interpreted as resolving any disputed issues of fact.

#### 1.  Configuration of Facilities and Systems

Tesoro primarily receives electrical power for the Refinery from a cogeneration plant (the "Cogen") operated by non-parties Foster Wheeler Martinez, Inc. and Martinez Cogen Limited Partnership (collectively, "FWM"),[2] but also maintains an agreement for standby electrical service from PG&E's grid, which Tesoro's predecessor entered into in 1988.  1st Am. Compl. ("FAC," dkt. 28) ¶ 16 & Ex. A; Answer (dkt. 35) ¶ 16; Sias Decl. (dkt. 80) Ex. 2 (Kromer Dep.) 42:12−16 & Ex. 3 (Carloni Dep.) 52:22−53:6.  The Refinery is connected to the PG&E grid through the Cogen, which is connected to PG&E's Tidewater Substation ("Tidewater," or the "Substation") by two 230 kilovolt lines.  Sias Decl. Ex. 1 (Carloni Dep.) 47:17−22; *id.* Ex. 2 (Kromer Dep.) 40:5−10.  Those connections allow the Cogen to sell electricity to the grid when it produces more than the Refinery draws from it, and also allow the Refinery to draw power from the grid when the Cogen does not produce enough power to meet its needs.  *See* Sias Decl. Ex. 3 (Carloni Dep.) 53:3−6.  Tidewater—which, in addition to the Cogen and Refinery, also serves PG&E's customers in Concord, California—is connected to the larger grid by two 230 kilovolt transmission lines, the Pittsburg and El Sobrante lines.  Sias Decl. Ex. 6 at 4; Begland Decl. Ex. 6 (Kromer Dep.) 67:11−12; Nie Decl. (dkt. 81) ¶ 2.

A meeting took place between PG&E and a predecessor to FWM (hereinafter referenced as FWM for convenience) in 1986.  *See* Begland Decl. Ex. 17.  During that meeting, PG&E and FWM discussed frequency settings for the Cogen, and PG&E assured FWM that PG&E's load

---

purposes pursuant to 28 U.S.C. § 636(c).

[2] FWM was briefly a party to this litigation after PG&E filed a third-party complaint against it. The Court granted FWM's motion to dismiss that complaint with prejudice on August 29, 2014. *See* Order Granting Third-Party Defendant's Motion to Dismiss (dkt. 50); *Tesoro Refining & Mktg. Co. LLC v. Pac. Gas & Elec. Co.*, No. 14-cv-00930-JCS, 2014 WL 4364393 (N.D. Cal. Aug. 29, 2014).

United States District Court
Northern District of California

United States District Court
Northern District of California

shedding system would activate before the grid frequency dropped to levels dangerous to the Cogen.  *Id.*  Tesoro's expert Brian Rahman testified that the load shedding systems at the Substation "had been disabled for some time, so they were no longer functioning" at the time of the 2010 outage.  Begland Decl. Ex. 7 (Rahman Dep.) 53:4−7.

### 2.  Pre-Outage Identification of Risks

#### a.  Synch Switches

Controls at the Tidewater Substation included a number of synchronization switches, or "synch switches."  Based on the configuration of the transmission lines at the Substation, placing more than one of the switches in the "on" position at the same time could result in a loss of power.  Accordingly,

> PG&E standard synch switch installation currently includes both of the following design mechanisms intended to prevent the incorrect operation of the synch switches:
>
> 1.  The switch is operated by a removable keyed handle.  There is a mechanical interlock that only allows the handle to be removed in the "OFF" position.
>
> 2.  There is one and only one keyed handle per substation control room.

Nie Decl. Ex. 1 (PG&E Root Cause Analysis) at PG&E0736.[3]  In other words, whenever one switch is in the "on" position, there is no way to turn any other switch to the "on" position without first turning the first switch off so that the handle can be moved to the second switch.

Richard White, who participated in an inspection of the Substation sometime in 2010 before the outage, testified that at the time of the inspection, he informed "the team that was involved" that the synch switches at Tidewater did not have a mechanical interlock feature.  Begland Decl. Ex. 8 (White Dep.) 41:9−25.  He also testified that the lack of that feature was a "fairly" serious design defect, and that he did not recall discussing the urgency of remedying the defect.  *Id.* 54:1−8, 56:22−57:1.  He did not recall any other instance in which he identified synch switches at a PG&E substation lacking the mechanical interlock feature.  *Id.* 43:22−44:2.  PG&E's

---

[3] To conserve space, this Order's citations to Bates numbers omit all but one leading zero.

United States District Court
Northern District of California

1  "Substation Switching Procedures" provide that when a circuit breaker is equipped with a synch

2  switch, the final step in operating the circuit breaker is to return the synch switch to the "off"

3  position.  Begland Decl. Ex. 10.

4          b.  Risk of Islanding

5      In April of 2010, PG&E engineer Sebastian Fiala prepared a "Load at Risk Notification"

6  reporting that if the Tidewater Substation became isolated or "islanded" from the grid as a whole,

7  "[t]he majority of the time, loading at Tidewater will exceed generation at [the Cogen], and will

8  likely cause [the Cogen] to trip offline."  Begland Decl. Ex. 1.  Such notifications are normally

9  "sent to a fairly wide audience within PG&E."  Begland Decl. Ex. 3 (Van Remoortere Dep.)

10  20:8−9.  The same notification was distributed again twelve days before the planned maintenance

11  on November 10, 2010.  Begland Decl. Ex. 4.  Tesoro's expert Brian Rahman later testified that

12  "good utility practice" would require PG&E to notify FWM and Tesoro that it identified that risk.

13  Begland Decl. Ex. 7 (Rahman Dep.) 160:1−163:2.

14      **3.  The Outage**

15      PG&E routinely notified FWM when maintenance or other circumstances required PG&E

16  to disconnect either of the transmission lines running to Tidewater.  *Id.* 67:2−14.  On October 29,

17  2010, PG&E notified FWM that it intended to disconnect a line for maintenance on November 9,

18  2010, thus placing the Cogen (and other Tidewater customers) "on a single source" from the grid.

19  Begland Decl. Ex. 4 at PG&E07647.  The maintenance ultimately took place on November 10,

20  2010, and required temporarily disconnecting the El Sobrante line.  Sias Decl. Ex. 6 at 4.  After

21  the maintenance was complete, PG&E called the FWM control room to report that both

22  transmission lines were back in service.  Begland Decl. Ex. 6 (Kromer Dep.) 78:15−24.

23      That afternoon, a power outage occurred.  A Root Cause Analysis Report that Tesoro later

24  submitted to Contra Costa County summarized the events of that day as follows:

25          On November 10th, the operations at both the refinery and FWM
were normal and steady. The refinery was drawing 68.5 MW from
26          FWM and FWM was sending 31 MW to the PG&E grid. That
morning, at 8:16 AM, PG&E was conducting maintenance on the
27          Tidewater Substation. PG&E opened circuit breaker 232, which
isolated the Tidewater Substation from the El Sobrante 230 KV line.
28          At 2:52 PM, circuit breaker 232 was closed, restoring the El

1
2
3
4
5
6
7
8

> Sobrante 230 KV line to the substation. At 3:09 PM, circuit breaker 232 reopened isolating the Substation from the El Sobrante 230 KV line. At 4:00 PM, circuit breaker 212 opened; this isolated the Tidewater Substation from the Pittsburg 230 KV line. The cause of both of these circuit breakers opening was not able to be determined.
>
> At this point both 230 KV lines were isolated from the Tidewater Substation and FWM became the sole power supply for both the refinery and North Concord. The turbine generators at FWM tripped off at 4:02 PM. This triggered FWM's automatic load shedding system and power was no longer supplied to the refinery. The refinery's processing units depressurized to the flare system as designed. In addition, circuit breakers 472 and 482, which tie FWM into the Tidewater Substation, opened isolating FWM from the substation.

9      Sias Decl. Ex. 6 at 4.  Auditory and visual alarms activated at PG&E's Grid Control Center after

10     the El Sobrante circuit breaker opened at 3:09 and again after the Pittsburg circuit breaker opened,

11     but PG&E's operators at the control center failed to respond to the alarms.  *See* Begland Decl. Ex.

12     16 (Cawaring Dep.) 47:21−48:11; Rahman Decl. (dkt. 89-8) ¶ 10.

13          No injuries were reported, but the outage "triggered a plant wide shutdown, which resulted

14     in excess flaring and visible black plumes of smoke" from the Refinery.   Sias Decl. Ex. 6 at 2−3.

15     Contra Costa County Health Services issued a "shelter in place warning" to members of the

16     surrounding community based on the potential effects of smoke from the Refinery's flaring

17     process.  *Id.* at 3.

18          PG&E also prepared a Root Cause Analysis, which stated that a maintenance supervisor

19     observed that two synch switches, corresponding to circuit breakers on the Pittsburg and El

20     Sobrante transmission lines, "were both in the 'ON' position on Nov.10th, when he arrived at the

21     substation following the outage."  Nie Decl. Ex. 1 at PG&E0736.  Although PG&E's analysis

22     identified other failures and ultimately found that it was "impossible to determine what damage, if

23     any, . . . was caused by the incorrect operation of the synch switches," PG&E characterized the

24     two switches "both being in the 'ON' position [as] an abnormal switching condition," and the only

25     short term corrective action recommended in the report was to upgrade the Tidewater synch

26     switches to include a mechanical interlock and to ensure that no other PG&E substation lacked

27
28

United States District Court
Northern District of California

United States District Court
Northern District of California

1  that feature.[4]  *Id.* at PG&E0736, 0739.  PG&E engineer Ben Nie, who participated in PG&E's

2  investigation of the outage, later testified that although he could not be certain what caused the

3  Substation outage, the erroneous operation of the synch switches was, in his view, the most likely

4  cause, and that it was the only concrete possible cause that PG&E identified.  Begland Decl. Ex.

5  12 (Nie Dep.) 68:9−25.  Nie also characterized the outage as a "transmission event" rather than a

6  "distribution event."  Sias Decl. Ex. 7 (Nie Dep.) 35:13−16.

7      Tesoro's Root Cause Analysis identified four potential root causes of the outage: (1) two

8  synch switches at the Substation were erroneously in the "on" position at the same time; (2) a

9  component of a programmable logic controller (PLC) at the Substation failed; (3) bushing

10  potential devices on two PG&E circuit breakers were damaged; and (4) "[t]here was no automatic

11  separation scheme or established operating procedure for opening of Circuit Breakers [connecting

12  the Substation to the Cogen] due to the loss of both PG[&]E 230 KV lines to the Tidewater

13  substation."  *Id.* at 5.  Brian Rahman, an expert witness for Tesoro, later concluded that the outage

14  was "the result of PG&E substation design, mis-operation of synch switches, lack of adequate

15  communication, substandard control equipment at Tidewater, and PG&E failure's [sic] to timely

16  identify and report the loss of the transmission sources feeding the Tidewater substation."  Sias

17  Decl. Ex. 8 (excerpt of Rahman's report).

18      Although FWM observed the frequency of its system drop to a problematically low level,

19  FWM did not realize that the Cogen was supporting PG&E's Concord customers.  Begland Dep.

20  Ex. 6 (Kromer Dep.) 79:11−15, 87:10−13.  Mike Kromer, a FWM plant manager at the time of the

21  outage, testified that if PG&E had notified FWM of the circumstances, FWM could have manually

22  disconnect the Cogen from the Tidewater Substation before the Cogen tripped offline.  *Id.*

23  131:2−132:10.

24      **B.    PG&E Electric Rule No. 14**

25      California law empowers the CPUC to "supervise and regulate every public utility in the

26  State."  Cal. Pub. Util. Code § 701.  Accordingly, the CPUC may "require utilities to file tariff

27  _____

28      [4] PG&E's inspections did not find any other substation lacking the interlock feature.  Nie Decl.
    Ex. 1 at PG&E0739.

6

schedules containing rates, charges and classifications, 'together with all rules, contracts, privileges, and facilities which in any manner affect or relate to rates, tolls, rentals, classifications, or service.'" *Waters v. Pac. Tel. Co.*, 12 Cal. 3d 1, 6 (1974) (quoting Cal. Pub. Util. Code § 489)). If approved by the CPUC, such rules have the effect of law. *Trammell v. W. Union Tel. Co.*, 57 Cal. App. 3d 538, 551 (1976).

PG&E's present motion concerns PG&E Electric Rule No. 14 ("Rule 14" or "Tariff Rule 14"), which is included in the record as Exhibit 1 to PG&E's Request for Judicial Notice (dkt. 79-1) and as Exhibit 2 to Tesoro's Request for Judicial Notice (dkt. 88). The present version of the relevant portion of Rule 14 became effective on January 23, 2003. Tariff Rule 14 at 1. The first three paragraphs of Rule 14, on which the parties primarily base their arguments, read as follows:

> PG&E will exercise reasonable diligence and care to furnish and deliver a continuous and sufficient supply of electric energy to the customer, but does not guarantee continuity or sufficiency of supply. PG&E will not be liable for interruption or shortage or insufficiency of supply, or any loss or damage of any kind of character occasioned thereby, if same is caused by inevitable accident, act of God, fire, strikes, riots, war, or any other cause except that arising from its failure to exercise reasonable diligence.
>
> PG&E shall be the sole judge of whether it is operationally able to receive or deliver electric energy through its electric distribution system. Such judgement [sic] shall be non-discriminatory and without regard to the supplier or electric service provider to the end-use customer.
>
> Under no circumstances shall PG&E be liable to its customers or their agents for any local or system deficiencies in supply stemming from inadequate power bids or power deliveries over the Independent System Operator (ISO) grid. *Similarly, PG&E shall not be liable to any customer, or electric service provider, for damages or losses resulting from interruption due to transmission constraint, allocation of transmission or intertie capacity, or other transmission related outage, planned or unplanned.*

*Id.* (emphasis added).

Utilities routinely file "advice letters" in conjunction with proposed tariff rules. *See* Sullivan Decl. (dkt. 89-9) ¶¶ 3−5. Advice Letter 1737-E, which accompanied the 1998 revision to Rule 14 in which the "other transmission related outage" limitation of liability clause first appeared, includes the following description of the changes to Rule 14:

United States District Court
Northern District of California

> Ordering Paragraph 3.a. of [CPUC Decision] D.97-10-087[5]
> approves changes to certain of PG&E's rules filed on July 15, 1997.
> The attached Rule 14 includes changes required for direct access.
> The revised rule addresses the responsibilities of end-use customers,
> Energy Service Providers (ESPs), scheduling coordinators, the
> Power Exchange (PX) and Independent System Operator (ISO) for
> dealing with shortages of supply and interruptions of delivery.

*Id.* Ex. 1 at ECF p. 7.  The advice letter goes on to state that "[t]his filing will not increase any rate

or charge, cause the withdrawal of service, or conflict with any rate schedule or rule."  *Id.* at ECF

p. 8.  Advice Letter 2328-E-B, which accompanied the most recent revision to Rule 14, indicates

that the only changes made were to remove references to the Power Exchange.  *See id.* Ex. 2 at

ECF pp. 2–3, 118.  Neither Advice Letter 1737-E nor Advice Letter 2328-E-B specifically

discusses the limitation of liability clause at issue here.  *See generally id.* Exs. 1, 2.

       The parties agreed at the October 16, 2015 hearing that no court has yet interpreted the

"other transmission related outage" clause of Rule 14.

### C.    Procedural History

       Tesoro filed this action on February 28, 2014, bringing claims for breach of contract,

negligence, and inverse condemnation.  *See generally* Compl. (dkt. 1).  In accordance with a

stipulated compromise after PG&E moved to dismiss Tesoro's request for punitive damages,

Tesoro filed its First Amended Complaint, which includes the same claims but omits the request

for punitive damages, on May 23, 2014.  *See generally* Mot. to Dismiss (dkt. 18); Stipulation

(dkts. 22, 27); 1st Am. Compl. (dkt. 28).  PG&E's Answer to Tesoro's First Amended Complaint

invokes "limitations of liability established in PG&E's Tariff Rule 14" as one of seventeen

affirmative defenses.  Answer (dkt. 35) ¶ 66.

       On August 29, 2014, the Court dismissed a third-party complaint that PG&E filed against

FWM for equitable indemnity, holding that PG&E failed to adequately allege that FWM was

---

[5] The parties did not address this decision in their briefs, but it does not appear to discuss any limitation of liability for transmission related outages.  *See* 76 CPUC 2d 287 (1997).  The CPUC actually rejected a proposed "broad disclaimer of liability for both the [utility] and the [non-utility electric service provider] 'for any indirect, special, consequential, or punitive damages of any kind whatsoever, either in contract, tort or strict liability,'" although that proposal appears to have been made in a context not applicable to the facts of this case.  *See id.* (discussion of proposed PG&E and Southern California Edison tariff section B.(17)).

liable to Tesoro in tort (as opposed to contract), as required under California law.  Order Granting Mot. to Dismiss 3d Party Compl. (dkt. 50).[6]  The Court also denied Tesoro's motion for leave to file an amended complaint seeking punitive damages nearly seven months after the stipulated deadline for seeking such amendment.  Order Denying Mot. for Leave to Amend (dkt. 109).

PG&E filed its present Motion on August 14, 2015, and the Court held a hearing on October 16, 2015.  Following the hearing, the Court requested that the CPUC file a response no later than November 19, 2015 addressing the scope of Rule 14.  *See* Order Requesting Opinion (dkt. 115).  The CPUC responded by letter dated November 13, 2015, offering assistance but explaining that that: (1) Tesoro would need to file an administrative complaint; and (2) the time needed for the CPUC's administrative proceedings would require the Court to stay this action. *See* Letter from CPUC General Counsel Arocles Aguilar (dkt. 118).  No party has requested a stay, and the Court declines to stay the case and continue the trial date sua sponte.

### D.    Parties' Arguments

#### 1.    PG&E's Motion

PG&E contends that it is entitled to summary judgment on Tesoro's breach of contract and negligence claims[7] because the incident at the Tidewater Substation was a "transmission related outage" and therefore falls within the limitation of liability provision of Tariff Rule 14.  *See* Mot. at 4.  According to PG&E, California courts have long recognized limitations of liability included in CPUC tariff rules.  *Id.* at 8 (citing, *e.g.*, *Waters v. Pac. Tel. Co.*, 12 Cal. 3d 1 (1974)).  Because the outage stemmed from the disconnection of two 230 kilovolt transmission lines, PG&E argues that a straightforward application of Rule 14 bars liability.  *Id.* at 9,

Although PG&E "disputes Tesoro's claim that the Tidewater Substation caused the outage at the Refinery," it does not argue that it is entitled to summary judgment for lack of evidence of causation or negligence—instead, the present Motion is limited to PG&E's defense based on Rule

---

[6] *Tesoro Refining & Mktg. Co. LLC v. Pac. Gas & Elec. Co.*, No. 14-cv-00930-JCS, 2014 WL 4364393 (N.D. Cal. Aug. 29, 2014).
[7] PG&E does not seek summary judgment as to Tesoro's inverse condemnation claim, conceding that because that claim arises from the California Constitution, it cannot be limited by a CPUC tariff.  Mot. at 10 n.5.

United States District Court
Northern District of California

1    14. *Id.* at 3 n.1.

2                        **2.  Tesoro's Opposition**

3          Much of Tesoro's Opposition is devoted to recounting the evidence that it contends

4    demonstrates negligence by PG&E.  Opp'n at 2−10.  With respect to PG&E's Rule 14 argument,

5    Tesoro responds that PG&E is bound by its statutory duty to "'exercise reasonable care in

6    operating its system'" under California Public Utilities Code § 451, which Tesoro contends "could

7    not be defeated by contract language," including a CPUC tariff rule.  *Id.* at 1−2, 10−11 (quoting

8    *Langley v. Pac. Gas & Elec. Co.*, 41 Cal. 2d 655, 661 (1953)).

9          Tesoro also seizes on the first paragraph of Rule 14, which provides that PG&E will

10   exercise reasonable diligence and will not be liable for any outage "except that arising from its

11   failure to exercise reasonable diligence."  *Id.* at 11 (quoting Tariff Rule 14).  Tesoro notes that the

12   equivalent tariff rules for the other two large investor-owned electric utilities in California,

13   Southern California Edison and San Diego Gas & Electric, have similar requirements to exercise

14   diligence and disclaimers of liability for non-negligent outages, but do not contain any provision

15   equivalent to the "other transmission related outage" clause of PG&E's Rule 14.  *Id.* at 11−12

16   (citing Pl.'s RJN (dkt. 88) Exs. 3, 4).  Tesoro suggests that the first paragraph of Rule 14 and the

17   structure of the other utilities' rules indicate a CPUC policy of retaining utilities' liability for

18   outages caused by their negligence, and that the third paragraph therefore does not bar liability for

19   transmission-related outages caused by PG&E's own negligence.  *See id.*

20         Next, Tesoro looks to the history of Rule 14 and PG&E's submission of the language at

21   issue for CPUC approval.  *Id.* at 12−16.  Tesoro notes that PG&E proposed adding the third

22   paragraph in the wake of deregulation[8] of the California electrical industry and the advent of

23   "direct access," which allowed customers to purchase electricity from providers of their choice,

24   transmitted through a statewide grid overseen by the newly-created Independent System Operator

25   (the "ISO").  *Id.* at 12−14 (citing, *e.g.*, *S. Cal. Edison Co. v. Pub. Utils. Comm'n*, 101 Cal. App.

26

27         [8] There is some question as to whether "deregulation" is an appropriate term for what might be
     more accurately described as a shift from one regulatory scheme to another in an industry that
28   remains subject to significant regulation.  This Order nevertheless uses the term "deregulation" as
     a shorthand for the regulatory changes affecting the California energy market in the 1990s.

*United States District Court*
*Northern District of California*

1   4th 385, 389−90 (2002)); *see also* CPUC Decision 95-12-063, 64 CPUC 2d 1 (1995) (outlining the

2   direct access program).[9]  According to Tesoro, "PG&E explained [to the CPUC] that the new

3   language in the tariff was being submitted for reasons having to do with direct access—and

4   nothing else." Opp'n at 14 (citing Sullivan Decl. Ex. 1 (Advice Letter 1737-E)).  Tesoro also

5   argues that the advice letter's assurance that the new language did not "'conflict with any rate

6   schedule or rule'" should estop PG&E from now arguing that it "constituted a wholesale change

7   from the existing rules." *Id.* at 16 (quoting Sullivan Decl. Ex. 1).  As support for its position that

8   the CPUC did not intend to immunize PG&E from negligence liability, Tesoro cites a subsequent

9   report and recommendation by CPUC staff addressing limitations of liability for

10  telecommunications utilities, which notes as a comparison that "'[i]n the energy services industry,

11  PG&E is only protected from damages that are beyond its control; however it is responsible for

12  reasonable damages resulting from its negligence,'" citing Rule 14.  *Id.* at 16 (quoting *Consumer*

13  *Protections for a Competitive Telecommunications Industry: Telecommunications Division Staff*

14  *Report and Recommendations*, Rulemaking Proceeding 00-02-0004, 2000 WL 346176 (Cal. P.U.C.

15  Feb. 3, 2000)).[10]

16          Finally, Tesoro contends that the structure of Rule 14 itself precludes PG&E's

17  interpretation of the clause at issue.  *Id.* at 17−20.  In addition to the first paragraph of Rule 14

18  discussed above, which states that PG&E must exercise diligence and only shields PG&E from

19  liability for outages not caused by negligence, Tesoro also looks to the "other transmission related

20  outage" clause's context in the third paragraph.  *Id.*  Tesoro argues that the paragraph as whole

21  evinces an intent to govern only outages outside of PG&E's control: the first sentence eliminates

22  liability for deficiencies in supply on the ISO grid, and the second sentence, which begins with the

23  word "similarly," lists outages caused by transmission constraints or capacity before concluding

24  with "other transmission related outage[s]." *Id.* at 17−19.

25  _____

26  [9] Previously, a customer purchased and received electricity from the utility operating the
    smaller regional grid encompassing that customer.

27  [10] Tesoro erroneously attributes this statement to a CPUC order.  Opp'n at 16.  The reference
    to PG&E's negligence liability is in fact found in the staff report and recommendation published

28  concurrently with the CPUC's Order Instituting Rulemaking initiating a proceeding to address
    telecommunications issues.  The order itself does not discuss PG&E.

United States District Court
Northern District of California

### 3.  PG&E's Reply

PG&E contends that Tariff Rule 14 unambiguously precludes liability for outages related to transmission, and that applying principles of contract interpretation, the Court therefore need not look beyond the text of the Rule.  Reply at 3−4, 6−8.  PG&E argues that Tesoro's proposed construction—reading the third paragraph to encompass only transmission outages outside of PG&E's control—would render the paragraph superfluous, because the first paragraph already provides that PG&E is not liable for outages unless caused by its lack of diligence.  *Id.* at 6−9.  PG&E also offers a declaration from its analyst Glenn Goldbeck disputing Tesoro's characterization of the issues addressed in the third paragraph as "classic ISO functions."  *Id.* at 8; Goldbeck Decl. (dkt. 102); *cf.* Opp'n at 18−19.

According to PG&E, the fact that the disputed provision is unique to its tariff rule is not significant, because other electrical utilities also have unique limitations of liability in their rules. Reply at 10−11.  PG&E cites, for example, a clause providing that Southern California Edison shall not be liable for lost profits or other consequential damages related to the construction and operation of certain facilities, even if caused by its negligence.  *Id.* at 11 (citing Def.'s Supp'l RJN (dkt. 103) Ex. 1 at 12).

PG&E also argues that even if the Court considers the context in which Rule 14 was proposed and adopted, "it fails to show that the Rule means something other than what it explicitly says."  *Id.* at 12.  According to PG&E, the reference in its advice letter to "'the responsibilities of *end-use customers*' for dealing with shortages of supply and interruptions of delivery" supports a broad reading of the limitation of liability, because it "specifically identified the effects of the revised Rule on end-use customers such as Tesoro."  *Id.* at 12 (quoting Sullivan Decl. Ex. 1) (emphasis added by PG&E).  PG&E also contends that Tesoro's reliance on the disclaimer of conflicts with other rules is misplaced because Tesoro "fails to identify any conflict between Revised Rule No. 14 and any other rate schedule or rule," and that the CPUC staff report referencing PG&E's liability for negligence is not significant evidence because it was not issued by the CPUC itself and did not focus on the electrical industry or PG&E.  *Id.* at 12−13.

PG&E disputes Tesoro's assertion that *Langley* and Utilities Code section 451 preclude a

1   limitation of liability for negligence, noting that California courts have upheld such limitations in

2   decisions since *Langley*.  Reply at 1, 4−5 (citing *Waters*, 12 Cal. 3d 1).  PG&E also rebuts

3   Tesoro's characterization of certain underlying facts related to the outage, but reasserts that it

4   "seeks summary judgment on the plain language of Rule No. 14," and that "[h]ow the

5   transmission failure occurred and whether the transmission failure caused the Refinery to lose

6   power is irrelevant" to the present Motion.  *Id.* at 14−15.

## III.   ANALYSIS

### A.   Preliminary Matters

#### 1.   Requests for Judicial Notice

The parties request that the Court take judicial notice of a number of tariff rules and similar

records filed with the CPUC, as well as a previous Order issued by the Court in this action.  *See*

*generally* Def.'s RJN (dkt. 79); Pl.'s RJN; Def.'s Supp'l RJN.  The Court takes judicial notice of

all of these documents as public records not reasonably subject to dispute.  *See Harris v. Cty. of*

*Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012).

#### 2.   Objections to Evidence

Pursuant to Civil Local Rule 7-3(d), after PG&E filed its Reply, Tesoro filed objections to

certain evidence submitted therewith.  *See generally* Objections (dkt. 107).

First, Tesoro objects to a declaration by PG&E's expert witness Richard Swanson setting

forth his conclusions regarding the underlying causes of the Refinery's loss of power.  *See id.* at 1;

Sias Reply Decl. (dkt. 101) Ex. 4.  Tesoro argues that because PG&E elected to limit its summary

judgment motion to the issue of Tariff Rule 14, it should not be permitted to challenge the

underlying facts of the outage using evidence submitted with its Reply, which Tesoro has no

opportunity to substantively oppose.  Objections at 1.  PG&E makes clear in both its Motion and

Reply that it does not seek summary judgment based on a lack of evidence of negligence or

causation.  *See* Mot. at 3 n.1; Reply at 14.  Swanson's report is not relevant to understanding the

scope of Rule 14's limitation of liability.  While striking the declaration for lack of relevance

would not be proper, the Court agrees with Tesoro that it has no bearing on the present Motion.

Second, Tesoro challenges the declaration of Glenn Goldbeck addressing the role of the

United States District Court
Northern District of California

ISO, on both procedural and substantive grounds.  Objections at 1−2.  Procedurally, Tesoro argues that PG&E failed to designate Goldbeck as a relevant witness, and that if PG&E wished to present evidence of the ISO's functions, it should have done so with its Motion so that Tesoro would have an opportunity to respond.  *Id.*  Substantively, Tesoro contends that the declaration lacks foundation because Goldbeck is not employed by or authorized to represent the ISO.  *Id.* at 2. Goldbeck's declaration addresses arguments first raised in Tesoro's Opposition, and it sets forth his basis for personal knowledge of ISO and PG&E roles and procedures regarding power generation and transmission.  Opp'n at 18−19; Goldbeck Decl. ¶¶ 1−3.  This declaration does not alter the outcome of the Motion, but the Court declines to strike it.

### B.   Legal Standard on Summary Judgment

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial."  *Id.*  "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986).  On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378 (2007), but where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587 (1986).

### C.   Interpretation of California Public Utility Tariff Rules
#### 1.   Context and Extrinsic Evidence

Although tariff rules approved by the CPUC have the force of law, California courts also construe them as contracts and apply principles of contract interpretation to resolve ambiguity. *E.g.*, *Pink Dot, Inc. v. Teleport Commc'ns Grp.*, 89 Cal. App. 4th 407, 415 (2001); *Transmix Corp. v. S. Pac. Co.*, 187 Cal. App. 2d 257, 263 (1960) ("A tariff is in the nature of a contract . . . ."); *but see Waters*, 12 Cal. 3d at 10 ("[G]eneral principles which might govern disputes

14

between private parties are not necessarily applicable to disputes with regulated utilities.").[11] And

while PG&E contends that the Court should rely solely on the text of Tariff Rule 14 because it is

"'clear and explicit,'" Reply at 4 (quoting Cal. Civ. Code § 1638), California law in fact calls for

fairly liberal use of extrinsic evidence to determine the meaning of a contract: "Even if a contract

appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which

reveals more than one possible meaning to which the language of the contract is yet reasonably

susceptible." *Morey v. Vannucci*, 64 Cal. App. 4th 904, 912 (1998) (citing *Pac. Gas & Elec. Co.

v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 40 & n.8 (1968); *Pac. Gas & Elec. Co. v.

Zuckerman*, 189 Cal. App. 3d 1113, 1140−41 (1987)). "If the court decides, after considering this

evidence, that the language of a contract, in the light of all the circumstances, is 'fairly susceptible

of either one of the two interpretations contended for . . . ,' extrinsic evidence relevant to prove

either of such meanings is admissible." *G.W. Thomas Drayage*, 69 Cal. 2d at 40 (quoting *Balfour

v. Fresno Canal & Irrigation Co.*, 109 Cal. 221, 225 (1895)) (citations omitted). "Indeed, it is

reversible error for a trial court to refuse to consider such extrinsic evidence on the basis of the

trial court's own conclusion that the language of the contract appears to be clear and unambiguous

on its face." *Morey*, 64 Cal. App. 4th at 912.

Under California law, conflicting extrinsic evidence as to a contract's meaning may require

resolution by a jury, and thus be inappropriate for resolution on a motion for summary judgment.

*See Morey*, 64 Cal. App. 4th at 912−13.  The Court is aware of no California cases applying that

principle to interpretation of CPUC tariff rules.  Because tariff rules have the effect of law and are

binding on the public, and because the extrinsic evidence at issue is comparable to legislative

history materials that courts routinely consider in resolving legal questions of statutory

construction, the Court holds that although principles of contract interpretation can be relevant to

the inquiry, interpretation of tariff rules adopted by the CPUC is a question of law appropriate for

the Court to resolve on summary judgment.  *See Waters*, 12 Cal. 3d at 10 ("[G]eneral principles

which might govern disputes between private parties are not necessarily applicable to disputes

---

[11] The parties appear to agree that tariff rules should at least in some circumstances be viewed as contracts.  *See* Opp'n at 11; Reply at 3−4 & n.3 (citing *Transmix*, 187 Cal. App. 2d at 263).

with regulated utilities.").

### 2. Limitations of Liability

"The subject of limitations upon liability of . . . utilities has long been considered to be a proper subject for commission regulation and supervision . . . ." *Waters*, 12 Cal. 3d at 6. "The limitation of liability provisions are an inherent part of the established rates and have the force and effect of law [and thus] are binding on the public generally . . . ." *Trammell v. W. Union Tel. Co.*, 57 Cal App. 3d 538, 551 (1976).[12]

In *Waters*, the California Supreme Court acknowledged that "ordinarily a provision which is intended to limit one's liability for negligence must clearly and explicitly express that purpose, and that it is for the courts to determine whether or not the provision possesses the requisite precision and clarity," but held that the tariff rule at issue in that case nevertheless served to limit the defendant telephone company's negligence liability. [13]  *Waters*, 12 Cal. 3d at 10.  In that case, however, the court relied on the "undisputed" fact "that the commission ha[d] approved a general policy of limiting the liability of telephone utilities for ordinary negligence to a specified credit allowance, and ha[d] relied upon the validity and effect of that policy in exercising its rate-making functions." *Id.*  In contrast, whether the CPUC intended to eliminate PG&E's liability for the sort of negligence at issue is heavily disputed in this case, and the evidence indicates that there is no "general policy" of eliminating such liability with respect to other electricity utility companies. *See* Opp'n at 11−12; Pl.'s RJN Exs. 3, 4.  Further, "'[t]he rule has been stated many times that if there is an ambiguity in a tariff any doubt in its interpretation is to be resolved in favor of the [nondrafter and against the utility].'"  *Pink Dot*, 89 Cal. App. 4th at 415 (quoting *Transmix*, 187 Cal. App. 2d at 267, and citing Cal. Civ. Code § 1654) (second alteration in original).  The Court therefore considers whether Tariff Rule 14 "clearly and explicitly express[es]" a purpose of

---

[12] At least one California court has held that CPUC tariffs cannot insulate a public utility from liability for intentionally tortious conduct.  *Pink Dot*, 89 Cal. App. 4th at 415.  Tesoro does not argue that its claims here are based on intentional conduct by PG&E.  *See generally* Opp'n; *see also* Mot. at 10 n.6.

[13] To the extent that Tesoro contends that a CPUC tariff cannot limit liability for breach of a utility's duty to exercise reasonable care, as codified in Utilities Code section 451 and recognized by the California Supreme Court in *Langley*, the Court agrees with PG&E that the *Waters* decision forecloses that argument.

United States District Court
Northern District of California

1    protecting PG&E from liability for its conduct related to the November 2010 outage at Tidewater

2    and the Refinery.  *See Waters*, 12 Cal. 3d at 10.[14]

3    ### D.    Tariff Rule 14 Is Ambiguous

4            The disputed language of Rule 14, read in context, is ambiguous.  It is not clear from the

5    face of the Rule what constitutes an "other transmission related outage."  Tariff Rule 14 at 1.

6    PG&E asserts that the provision encompasses any outage related to systems operating at voltage

7    levels designated as "Transmission Voltages" in a separate tariff rule, PG&E Electric Rule No. 2.

8    *See* Mot. at 5 n.2; Pl.'s RJN Ex. 2.  But there is no reference to that definition or Rule in the

9    relevant portion of Rule 14, i.e., Sheet 1, addressing "End Use Customer and Their Agents."  *See*

10   Tariff Rule 14 at 1.  Moreover, the first paragraph of Rule 14 establishes that PG&E has a duty of

11   reasonable diligence, and immunizes PG&E from liability for service interruptions that are *not*

12   caused by PG&E's failure to fulfill that duty.  Rule 14 does not explicitly indicate whether the

13   third paragraph—barring liability for inadequate bids and supply on the ISO grid, transmission

14   capacity and constraints, and "other transmission related outage[s]"— is intended as an exception

15   or clarification of the first paragraph's general rule that PG&E must "exercise reasonable

16   diligence" and is only absolved of liability if not caused by its failure to do so.  *See id.*

17           Looking, as the Court must, to context beyond the face of the Rule—*see Morey*, 64 Cal.

18   App. 4th at 912—the Court finds further reasons to conclude that it is ambiguous.  PG&E

19   proposed adding the language at issue in the immediate wake of structural changes to electricity

20   transmission in California, which shifted certain roles formerly occupied by PG&E within its

21   operating region to other entities, including allowing other providers of electricity to sell over the

22   grid to customers in that region, and vesting the ISO with authority to manage and operate the

23   grid.  *See, e.g.*, Cal. Pub. Util. Code § 330(m) ("It is the intention of the Legislature that

24   California's publicly owned electric utilities and investor-owned electric utilities should commit

25

26        [14] "[A]lthough a particular limitation provision may be challenged as unreasonable, the
     question of reasonableness should first be directed to the [CPUC], not the trial courts."  *Waters*, 12
27   Cal. 3d at 7 (discussing *Cole v. Pac. Tel. & Tel. Co.*, 112 Cal. App. 2d 416, 419 (1952)).  Here,
     Tesoro argues only that Tariff Rule 14 does not provide the broad limitation of liability that PG&E
28   asserts; Tesoro does not ask the Court to modify or invalidate Rule 14 as unreasonable.  *See* Opp'n
     at 16−17.

United States District Court
Northern District of California

control of their transmission facilities to the Independent System Operator.").  The advice letter that PG&E submitted to the CPUC indicated that the "attached Rule 14 includes changes required for direct access," which tends to support reading the "other transmission related outage" clause as encompassing new scenarios made possible by the recent regulatory changes.  *See* Sullivan Decl. Ex. 1.  Because the clause is ambiguous in context, the Court must consider that context in determining its meaning.

**E.    Tariff Rule 14 Does Not Bar Liability for an Outage Caused by PG&E's Negligence Under the Facts of This Case**

The Court agrees with PG&E that, read in isolation, Tariff Rule 14 is amenable to the reading PG&E proposes.  As discussed above, it is not clear from the face of the rule whether the third paragraph is an exception or clarification of the general policy that PG&E is liable for damage arising from its negligence.  Further, Electric Rule No. 2 could provide some support for defining an "other transmission related outage" in the context of Rule 14 as any outage related to equipment operating at transmission-level voltages.  Based on the context as a whole, however, the Court concludes that the CPUC did not intend to shield PG&E from the sort of negligence that allegedly occurred here.

The more specific limitations of liability set forth in the third paragraph of the Rule all relate to functions that were at least partially divested from PG&E by the direct access deregulation.  The first sentence of that paragraph bars liability for "deficiencies in supply stemming from inadequate power bids or power deliveries over the [ISO] grid."  Tariff Rule 14 at 1.  "Market participants, including PG&E, submit bids into the [ISO] wholesale energy markets" and deliver power to the grid.  *See* Goldbeck Decl. ¶ 6.  The deregulation plan caused PG&E to be one of many such market participants, and reduced the degree of control PG&E exercised over power supplied within its own service area.  *See generally* Cal. Pub. Util. Code § 330; CPUC Decision 95-12-063, 64 CPUC 2d 1 (1995) (outlining the direct access program).  Accordingly, the overall supply of energy to the ISO grid depends on the bids and output of many participants, and this new language of Rule 14 made clear that PG&E would not be liable if bids or deliveries fell short of demand.  Contrary to PG&E's suggestion in its Reply, Goldbeck's declaration does

18

1    not indicate that this sentence was intended to shield PG&E from liability for its own negligence.

2    The second sentence of the third paragraph begins with the word "similarly," which means

3    that the restrictions to follow are related to the restrictions just recited, i.e., limitations of liability

4    for decisions and contingencies that PG&E could no longer exclusively control.  The first two

5    examples of the second sentence support this conclusion:  "interruption due to transmission

6    constraint" and "allocation of transmission or intertie capacity" are no longer within PG&E's

7    exclusive control.  *See* Tariff Rule 14 at 1.  Under the deregulation program that prompted

8    PG&E's Rule 14 proposal, "[t]he [ISO] is responsible for operation and management of the

9    California transmission grid in PG&E's service area, as well as other locations."  Goldbeck Decl.

10    ¶ 4.  Accordingly, PG&E no longer had the same degree of control over transmission constraints

11    and allocation within its service area as it did before the regulatory changes.  These examples do

12    not appear to contemplate limiting liability for PG&E's own negligence.

13    The second sentence concludes with the provision at issue, that PG&E is also not liable for

14    "other transmission related outage, planned or unplanned."  Tariff Rule 14 at 1.  The broad reading

15    that PG&E proposes—barring liability for any outage above a certain voltage, even if caused by

16    PG&E's own equipment or operator error—is incongruent in comparison to the more specific

17    limitations of liability discussed above, all of which relate to functions transferred to or shared

18    with other entities as part of the deregulation and "direct access" program.

19    Moreover, the advice letter that PG&E submitted to the CPUC with the proposed tariff rule

20    includes no reference to the broad liability waiver PG&E seeks here.  To the contrary, the letter

21    characterized the revised Rule as making "changes required for direct access."  *See* Sullivan Decl.

22    Ex. 1.  PG&E offers no explanation whatsoever for how a broad limitation of liability for its own

23    negligence in its own operations, and specifically operations that it had engaged in long before

24    deregulation, would be a "change[] required for direct access."  *See id.*  Instead, PG&E relies on

25    the vague statement in the advice letter that the revision "addresses the responsibilities of end-use

26    customers, Energy Service Providers (ESPs), scheduling coordinators, the Power Exchange (PX)

27    and Independent System Operator (ISO) for dealing with shortages of supply and interruptions of

28    delivery."  *See id.*; Reply at 12.  Contrary to PG&E's characterization, that statement decidedly

United States District Court
Northern District of California

19

United States District Court
Northern District of California

1  does not "specifically identif[y] the effects of the revised Rule on end-use customers such as

2  Tesoro." *See* Reply at 12.

3         PG&E's other arguments for construing the "other transmission related outage" clause to

4  bar liability for its own negligence are not persuasive.  Although a narrower reading is arguably

5  redundant to the first paragraph of the Rule (which bars liability except for PG&E's failure to

6  exercise diligence), the "'preference for avoiding surplusage constructions is not absolute.'" *King*,

7  135 S. Ct. 2480, 2483 (2015) (quoting *Lamie v. U.S. Trustee*, 540 U.S. 526, 536 (2004)).  A

8  "rigorous application of that canon does not seem particularly useful" where there are reasonable

9  explanations for surplus language.  *Id.*  Much as the Supreme Court held that some degree of

10  superfluous drafting was to be expected in the context of the Affordable Care Act, *see id.*, it is

11  reasonable to think that a utility like PG&E would seek a belt-and-suspenders approach to limiting

12  liability for events outside its control in the context of an industry overhaul that introduced new

13  opportunities for such events to arise, even if PG&E may well have been protected under the

14  existing tariff rule.  Moreover, either interpretation arguably renders some language redundant:

15  while Tesoro's reading is in some ways redundant to the first paragraph, PG&E's reading would

16  make superfluous the specific examples of transmission constraints and allocation.

17         The cases that PG&E cites finding limitations of negligence liability under CPUC tariff

18  rules are not analogous to the case at hand.  As discussed above, the California Supreme Court's

19  decision in *Waters* rested on the CPUC's "undisputed" approval of "a general policy of limiting

20  the liability of telephone utilities for ordinary negligence to a specified credit allowance," and its

21  reliance "upon the validity and effect of that policy in exercising its rate-making functions."

22  *Waters*, 12 Cal. 3d at 10.  There is no evidence here of any such general policy regarding electrical

23  utilities' liability for outages involving transmission-level voltages.  In *Stern v. General Telephone

24  Co.*, 50 Cal. App. 3d 538 (1975), the court of appeal considered a telephone tariff "substantially

25  the same as" the tariff in *Waters*, and relied heavily on both the *Waters* decision and the CPUC's

26  explicit declaration of purpose to limit telephone companies' liability for gross negligence.  *Stern*,

27  50 Cal. App. 3d at 541−42.  PG&E cites no such declaration of purpose here.  Finally, in

28  *Trammell v. Western Union Telegraph Co.*, the CPUC had approved a tariff rule that specifically

1    addressed "mistakes or delays in the transmission or delivery or for nondelivery of any message,"

2    and limited recovery for such "mistakes" to $500.  *Trammell*, 57 Cal. App 3d at 548−556 & n.3.

3    Here, Tariff Rule 14 makes no clear reference to limiting PG&E's liability for its own mistakes.[15]

4         PG&E offers no evidence or authority that the CPUC, any court, or even PG&E itself has

5    ever construed Rule 14 as the broad limitation of negligence liability that it now asserts.  There is

6    no indication that PG&E intended to avoid such liability when it submitted Rule 14, or that the

7    CPUC intended to grant such broad immunity when it approved the Rule.  Based on the record

8    available—which indicates that the revisions were "changes required for direct access" and were

9    submitted in response to a CPUC decision that addressed deregulation and did not address

10   negligent operation of transmission lines by PG&E—the revisions to the Rule appear to have been

11   intended to ensure that PG&E would not be exposed to new liability as a result of deregulation.

12   *See* Sullivan Decl. Ex. 1; CPUC D.97-10-087, 76 CPUC 2d 287.  And while it is conceivable, as

13   PG&E suggests, that the CPUC might conclude "that exposing PG&E to the potentially large

14   damages that could arise from transmission outages could lead to higher rates," *see* Reply at 9,

15   there is no indication that the CPUC reached such a conclusion here, nor any explanation why

16   such a change would be "required for direct access," *see* Sullivan Decl. Ex. 1.  The record

17   indicates that PG&E provided standby power to Tesoro under substantially the same arrangement

18   well before the advent of direct access; there is no apparent reason why that program would

19   require changes to PG&E's potential liability under its standby power agreement.

20        Based on the specific examples in the third paragraph, the purpose of the revisions to Rule

21   14 as stated in the 1998 Advice Letter, and the nature of the regulatory changes prompting those

22   revisions, the third paragraph appears to have been intended to ensure at the very least that PG&E

23   would not be held liable for consequences outside of its control, and perhaps to avoid complex

24   inquiries to determine an exact cause where circumstances contributing to an outage lie at the

25   intersection of the roles and responsibilities of PG&E, other market participants, and new entities

26

27        [15] The Court also notes that the rules at issue in each of those cases allowed a customer some
     limited recovery for a utility's negligence, while PG&E's proposed reading of Rule 14 would
28   absolve it of liability entirely for negligence that causes high-voltage outages.

United States District Court
Northern District of California

like the ISO.  There is no indication that the CPUC intended to preclude all liability for every

outage at a transmission-grade voltage.

The Court need not, however, determine the precise contours of Rule 14 to resolve the

present Motion.  Taking into account the general rule that a limitation of "liability for negligence

must clearly and explicitly express that purpose," *Waters*, 12 Cal. 3d at 10, as well as the

California courts' instruction to resolve any doubt as to "an ambiguity in a tariff . . . in favor of the

nondrafter and against the utility," *Pink Dot*, 89 Cal. App. 4th at 415 (brackets and citation

omitted), the Court is satisfied for the reasons stated above that the "other transmission related

outage" clause of Tariff Rule 14 does not absolve PG&E of liability for its own negligent

operation or maintenance of electricity transmission systems at the Tidewater Substation in

fulfilling its longstanding obligations under the standby power agreement with Tesoro.  Viewing

the record in the light most favorable to Tesoro, a reasonable jury could find that the outage at the

Refinery resulted from such negligence.  PG&E's Motion for Partial Summary Judgment is

therefore DENIED.

**F.    Tariff Rule 14 Bars Recovery on Tesoro's Breach of Contract Claim Unless Tesoro Proves that PG&E Was Negligent**

The parties' briefs do not address the application of Rule 14 if Tesoro fails to prove

negligence by PG&E.  Tesoro does not appear to dispute that the first paragraph of the Rule

absolves PG&E of liability for outages that are not caused by PG&E's negligence.  The contract

on which Tesoro bases its claim explicitly provides that it is subject to PG&E's "applicable

electric rates and rules as regularly established from time to time and on file the with California

Public Utilities Commission." FAC Ex. A ¶ 1.  Accordingly, Tesoro cannot recover on its breach

of contract claim unless it shows that the Refinery outage "ar[ose] from [PG&E's] failure to

exercise reasonable diligence."  Tariff Rule 14 at 1.

/ / /

/ / /

/ / /

/ / /

United States District Court
Northern District of California

22

**IV.    CONCLUSION**

For the reasons stated above, the Court holds that Tariff Rule 14 was not intended to and does not absolve PG&E of liability for its own negligent operation or maintenance of electricity transmission systems, and accordingly DENIES PG&E's Motion for Partial Summary Judgment.

**IT IS SO ORDERED.**

Dated: November 20, 2015

_____
JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California

23