United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TESORO REFINING & MARKETING
COMPANY LLC,

            Plaintiff,

    v.

PACIFIC GAS AND ELECTRIC
COMPANY,

            Defendant.

Case No.  14-cv-00930-JCS

**ORDER GRANTING IN PART AND
DENYING IN PART MOTIONS TO
EXCLUDE EXPERT TESTIMONY AND
MOTIONS IN LIMINE**

Re: Dkt. Nos. 123, 128, 141, 144, 145, 146,
147, 149, 150, 151, 152

## I.    INTRODUCTION

      This case involves allegations by Plaintiff Tesoro Refining & Marketing Company LLC ("Tesoro") that Defendant Pacific Gas and Electric Company ("PG&E") is responsible for damage and loss caused by a power outage at Tesoro's Golden Eagle Refinery (the "Refinery") in Martinez, California.  Trial is set to begin on January 19, 2016, and each party moves to exclude testimony by the opposing party's expert witness pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), among other authorities.  The parties have also each filed motions in limine.  The Court heard argument on January 8, 2016.  For the reasons stated below, both *Daubert* motions are GRANTED IN PART AND DENIED IN PART.  The rulings on the motions in limine are set forth below.[1]

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

## II.     BACKGROUND

### A.     Factual Overview[2]

Although the Refinery primarily drew power from an adjacent cogeneration plant (the "Cogen") operated by non-parties Foster Wheeler Martinez, Inc. and Martinez Cogen Limited Partnership (collectively, "FWM" or "FW"), Tesoro had an agreement for standby electricity service from PG&E.  In November of 2010, an unexpected disruption of PG&E's transmission lines to PG&E's Tidewater Substation (the "Substation") isolated, or "islanded," the Refinery, the Cogen, and local PG&E customers in Concord, California from PG&E's electrical grid, with the Cogen as the only remaining source of power for the Refinery and the other local customers. The Cogen tripped offline, causing an unplanned loss of power at the Refinery and allegedly damaging the Refinery.

### B.     Overview of Expert Discovery and Motions to Exclude Expert Testimony

Pursuant to the parties' stipulation adopted by the Court as a scheduling order, expert disclosures were due June 19, 2015, rebuttal disclosures were due July 17, 2015, and expert discovery closed on July 31, 2015.  *See* Revised Stipulation and Order to Modify Scheduling Order (dkt. 63) at 3.

#### 1.   Tesoro's Expert and PG&E's Motion to Exclude

On June 19, 2015, Tesoro disclosed Brian Rahman as a possible expert witness and served PG&E with Rahman's initial report.  Jackel Decl. (dkt. 124) ¶ 2 & Ex. 2 ("Rahman Report"). Rahman is an electrical engineer who has specialized in bulk electric power systems engineering since 1991, including positions with PG&E and the California Independent System Operator. Rahman's report includes opinions that the Cogen tripped offline because it was overloaded when the Substation and its customers became isolated from the PG&E grid, that PG&E had advance knowledge of that risk, and that PG&E failed to operate its equipment properly, failed to detect the loss of transmissions, failed to notify FWM of the situation, and failed to prevent the overload. *See*

---

[2] This section is intended only as a brief summary.  The Court's previous Order, denying a motion for partial summary judgment by PG&E, provides a more detailed description of the facts of the case. *See Tesoro Refining & Mktg. Co. LLC v. Pac. Gas & Elec. Co.*, __ F. Supp. 3d __, 2015 WL 7350446 (N.D. Cal. Nov. 20, 2015).

United States District Court
Northern District of California

*generally* Rahman Report.  Rahman also prepared a rebuttal report responding to the opinions of PG&E's expert Richard Swanson, and Tesoro served the rebuttal report on PG&E on July 17, 2015.  Jackel Decl. ¶ 3 & Ex. 3 ("Rahman Rebuttal Report").

PG&E took Rahman's deposition on July 27, 2015.  *Id.* ¶ 7 & Ex. 5 ("Rahman Dep.").  Tesoro served PG&E with errata to the deposition transcript on September 9, 2015.  *Id.* ¶ 8 & Ex. 6.  After PG&E provided certain data—"as a courtesy and without waiving any right object a later date"—at Tesoro's request on October 21, 2015, Tesoro served on PG&E an "Amended and Supplemented Report" by Rahman.  *Id.* ¶¶ 12, 17 & Ex. 15 ("Rahman Supp'l Report").

PG&E moves to exclude testimony regarding several of Rahman's opinions under *Daubert*.  *See* PG&E Mot. (dkt. 123).  PG&E also moves to strike an opinion based on a document that Rahman did not initially indicate he relied on and the use of which, PG&E contends, violates a non-disclosure agreement.  *Id.* at 21–23.  PG&E moves to strike the Amended and Supplemental Report in full for failure to comply with the Court's scheduling order.  *Id.* at 23–25.  Tesoro opposes PG&E's Motion.  *See* Tesoro Opp'n (dkt. 137).  The parties' stipulated briefing schedule for their motions to exclude expert testimony does not call for reply briefs.

### 2.  PG&E's Expert and Tesoro's Motion to Exclude

PG&E disclosed its expert witness Richard Swanson and served his initial report on Tesoro on June 19, 2015.  Begland Decl. (dkt. 128-1) ¶ 2 & Ex. A ("Swanson Report").  Swanson's primary opinions are that the loss of power to the Refinery resulted from errors by FWM in responding to the Substation outage, that the Cogen went offline due to failure to change a frequency setting rather than due to excessive load, that FWM did not adequately maintain a system to separate the Cogen and Refinery from the Substation if needed, and that Tesoro did not comply with industry best practices to ensure a reliable supply of electricity to the Refinery.  Swanson Report ¶¶ 15–17, 105–06.  He did not address and will not offer testimony regarding the cause of the Substation outage that preceded the Cogen tripping offline.  *See generally id.*; *see also* Swanson Dep. (Begland Decl. Ex. C) 78:3–6, 80:1–7.  The basis for Swanson's testimony includes experience as a consultant advising industrial clients in project management and electrical supply, twenty-eight years of experience working as a utility systems specialist for a refining company,

3

1   and review of documents related to this case provided by PG&E's counsel.  Swanson Dep. 76:2–5;

2   Swanson Report ¶¶ 9–10.

3        Swanson prepared a rebuttal report responding to Rahman's initial report, and PG&E

4   served that on Tesoro on July 17, 2015.  Begland Decl. ¶ 3 & Ex. B ("Swanson Rebuttal Report").

5   Tesoro's counsel took Swanson's deposition on July 28, 2015.  *Id.* ¶ 4 & Ex. C. Tesoro filed its

6   motion to exclude three of Swanson's opinions pursuant to *Daubert* on December 2, 2015.  *See*

7   Tesoro Mot. (dkt. 128).  PG&E opposes Tesoro's Motion.  *See* PG&E Opp'n (dkt. 136).

8        **C.     Overview of Motions in Limine**

9        PG&E has filed four motions in limine and Tesoro has filed five motions in limine.  PG&E

10   seeks to exclude evidence and argument related to: (1) purported inaccuracy or incompleteness of

11   PG&E's Root Cause Analysis addressing the outage at the Substation; (2) a purported contractual

12   obligation to "stand ready at all times to delivery or supply and delivery electric energy to

13   [Tesoro's] premises on an as-needed basis"; (3) unrelated acts of PG&E—including a gas pipeline

14   explosion in 2010—and ensuing regulatory, civil, or criminal proceedings; and (4) potential risk of

15   explosion, fire, and physical damage resulting from power outages at refineries.  Tesoro seeks to

16   exclude evidence and argument related to: (1) Tesoro's submissions to county and regional

17   regulators; (2) a Notice of Violation issued by a regional air quality district; (3) compromise offers

18   made to the air quality district; (4) other electrical outages at the Refinery; and (5) out of court

19   statements by a consultant Tesoro retained during its investigation of the outage.

20   **III.    ANALYSIS OF MOTIONS TO EXCLUDE EXPERT TESTIMONY**

21       **A.     Legal Standard for Expert Testimony**

22        Rule 702 of the Federal Rules of Evidence permits a party to offer testimony by a "witness

23   who is qualified as an expert by knowledge, skill, experience, training, or education."  Fed. R.

24   Evid. 702.  This Rule embodies a "relaxation of the usual requirement of firsthand knowledge,"

25   *Daubert*, 509 U.S. at 592, and requires that certain criteria be met before expert testimony is

26   admissible.  The Rule sets forth four elements, allowing such testimony only if:

27            (a) the expert's scientific, technical, or other specialized knowledge
               will help the trier of fact to understand the evidence or determine a
28            fact in issue;

4

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. These criteria can be distilled to two overarching considerations: "reliability and relevance." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). The inquiry does not, however, "require a court to admit or exclude evidence based on its persuasiveness." *Id.*

The reliability prong requires the court to "act as a 'gatekeeper' to exclude junk science," and grants the court "broad latitude not only in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." *Id.* (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145, 147–49, 152 (1999)). Evidence should be excluded as unreliable if it "suffer[s] from serious methodological flaws." *Obrey v. Johnson*, 400 F.3d 691, 696 (9th Cir. 2005).

The relevance prong looks to whether the evidence "fits" the issues to be decided: "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes," and "[e]xpert testimony which does not relate to any issue in the case is not relevant." *Daubert*, 509 U.S. at 591. "Where an 'expert report' amounts to written advocacy . . . akin to a supplemental brief, a motion to strike is appropriate because this evidence is not useful . . . ." *Williams v. Lockheed Martin Corp.*, No. 09CV1669 WQH (POR), 2011 WL 2200631, at *15 (S.D. Cal. June 2, 2011) (citation omitted; first ellipsis in original).

In addition to arguments based on the standards set forth above, the parties also contend that certain testimony should be stricken or excluded on procedural grounds. This Order addresses the appropriate legal standards for such arguments in context below.

### B.   PG&E's Motion to Strike and Exclude Rahman's Testimony

One section of PG&E's Motion is prefaced with the title "Mr. Rahman's opinions do not qualify as proper expert testimony and must be excluded." PG&E Mot. at 10 (capitalization altered). Despite the apparent breadth of that assertion, PG&E does not actually argue that Rahman's opinions should be excluded in their entirety. Instead, PG&E argues that the following

opinions from Rahman's reports and testimony do not satisfy *Daubert*'s reliability standard: (1) that after the transmission lines to the Substation were disconnected, the Cogen tripped offline because load exceeded generation, *id.* at 12–14; (2) that PG&E knew in advance that the Cogen would or could trip offline if the Substation became islanded, *id.* at 14–15; (3) various conclusions regarding load shedding based on a 1986 FWM memorandum, *id.* at 15–19; (4) opinions regarding how FWM would have responded if PG&E had notified FWM when the first or second transmission line became disconnected, *id.* at 19–20; and (5) opinions regarding the reasonableness of Tesoro's conduct, *id.* at 20–21.  PG&E also argues that Rahman should not be permitted to testify based on purportedly confidential information he obtained pursuant to a non-disclosure agreement with the Federal Energy Regulatory Commission ("FERC"), *id.* at 21–23, and that his November 3, 2015 supplemental report should be stricken as untimely, *id.* at 23–25. This Order addresses each argument in turn.

PG&E's Motion does not argue that Rahman should be precluded from testifying as to other potentially relevant issues discussed in his Reports, such as the operation of synch switches and the significance of a mechanical interlock feature on those switches.  *See, e.g.*, Rahman Report at 8–15.  The Court need not address the adequacy of those opinions.

### 1. Opinions Regarding Cause of the Cogen Outage

At his deposition, Rahman testified that after the transmission lines became disconnected, there was a "mismatch" between load and generation of "roughly 1 to 2 megawatts," which he characterized as something "that could be considered a significant issue."  Rahman Dep. 87:19–88:5.  He also testified that he was "fairly confident" that the mismatch caused the Cogen to trip offline, although he stated at the same time that "the load was right around [the] same amount" as the Cogen's rated capacity.  *Id.* 95:6–22.  PG&E argues that because Rahman "performed no technical analysis to determine why the Cogen, in fact, tripped offline," and "did not examine whether the FW generators could generate above their permitted capacity" or "review any settings of the FW generators," he should not be permitted to testify about whether the increased load would cause the Cogen to trip offline.  PG&E Mot. at 12 (citing Rahman Dep. 86:9–11, 91:21–24).  According to PG&E, Rahman's opinion comes down to "basic arithmetic" that the combined

loads of the Refinery and PG&E's Concord customers exceeded the Cogen's rated capacity by one or two megawatts, which the jury is capable of understanding without expert testimony. *Id.* at 13–14.

Tesoro notes that although Rahman testified at his deposition that a mismatch between load and generation caused the Cogen to trip offline, that is not "set forth as an independent opinion" in Rahman's report. Tesoro Opp'n at 7. This appears to be a semantic distinction—Rahman's report concludes that "the unplanned outage of November 10th, 2010 at Tidewater directly impacted FWM['s] ability to remain on-line serving [the] Tesoro refinery load," Rahman Report at 18–19, and the only basis for that conclusion that either party has identified in Rahman's reports or testimony is the purported mismatch between load and generation that resulted from the outage at Tidewater. The Court therefore concludes that the mismatch theory is essential to one of Rahman's ultimate opinions expressed in his Report.

As Tesoro correctly argues in its Opposition, Rahman's experience as an electrical engineer overseeing transmission and generation facilities provides a basis for him to testify as to the typical effects of an unexpected mismatch between load and generation. *See* Opp'n at 1 (citing Rahman Dep. 109:6–13, 132:20–134:23). Tesoro also notes Rahman's testimony that under-speed relays at FWM were activated on the day of the outage, indicating that the generators were not able to meet the load on the system. *Id.* at 7–8 (citing Rahman Dep. 93:7–94:1). PG&E's Motion does not address that testimony. Rahman's testimony regarding the under-speed relays immediately preceded his statement that he was "fairly confident" that a mismatch caused the generators to trip offline. Rahman Dep. 93:7–95:10.

PG&E points to testimony from other witnesses that the Cogen was in fact capable of generating more than its rated capacity, potentially up to 114 megawatts. PG&E Mot. at 13. However, it is not clear from PG&E's Motion whether any fact witness testified that the Cogen could tolerate an *unexpected* increase in load beyond its rated capacity. Moreover, it is not the Court's role on a *Daubert* motion to weigh and resolve conflicting evidence, or "admit or exclude evidence based on its persuasiveness." *Ellis*, 657 F.3d at 982. PG&E's Motion is therefore DENIED as to Rahman's opinions regarding the mismatch between load and generation. PG&E

1   is, of course, free to introduce evidence rebutting Rahman's conclusions and to cross examine

2   Rahman regarding steps he did or did not take in reaching those conclusions.

3       **2. Opinion Regarding PG&E's Knowledge of Risk Based on Fiala Analysis**

4       Rahman concluded that PG&E should have communicated a risk of islanding to FWM and

5   Tesoro because PG&E's Grid Control Center received a Load at Risk Notification prepared by

6   PG&E engineer Sebastian Fiala several months before the outage, which stated that excessive load

7   on the Cogen could cause it to trip offline if the Substation and its customers became islanded.[3]

8   *See, e.g.*, Rahman Report at 5–7.

9       PG&E challenges the relevance of this conclusion in part based on its position that

10  Rahman should not be permitted to testify that a mismatch between load and generation (similar to

11  the risk described in Fiala's notification) caused the Cogen to trip offline.  *See* PG&E Mot. at 14.

12  The Court disagrees with that position for the reasons discussed above, and thus need not engage

13  in hypothetical analysis of whether PG&E's response, or lack therefore, to the Load at Risk

14  Notification would be relevant absent permissible testimony that a mismatch caused the Cogen

15  outage.

16      PG&E also argues that the "speculative 'mismatches'" addressed in the Load at Risk

17  Notification "have nothing to do with what happened on November 10," because the actual

18  mismatch on the date of the outage was much smaller than the estimates used in Fiala's model.  *Id.*

19  at 15.  The Court agrees with PG&E that Fiala's hypothetical analysis is not evidence probative of

20  what actually occurred during the outage.  It follows that Rahman may not base his opinion as to

21  what actually occurred on the Load at Risk Notification.  The Load at Risk Notification may

22  nevertheless be relevant to show that PG&E was aware of the risk that the Cogen would trip

23  offline if the Substation became islanded, and Rahman may present his opinion regarding how a

24  reasonable utility operator would have responded to the notification.  Rahman's professional

25  experience, including as a former PG&E electrical engineer, is a sufficient basis for him to testify

26

27  [3] "Limiting Element # 3: Tidewater Banks #1 and #2 and Foster Wheeler are out of service or
    islanded.  Under/over voltage and under/over frequency can result.  The majority of the time,

28  loading at Tidewater will exceed generation at Foster Wheeler, and will likely cause Foster
    Wheeler units to trip offline."  Rahman Report at 3 (quoting a document produced by PG&E).

United States District Court
Northern District of California

United States District Court
Northern District of California

regarding the significance of a Load at Risk Notification and steps that grid operators might be expected to take once they were aware of that risk.  PG&E's Motion is DENIED as to that sort of testimony.

The reasonableness of the prediction stated in the Load at Risk Notification is a somewhat different issue.  To the extent that the Load at Risk Notification is used to show knowledge of risk, the fact that it was based on larger hypothetical loads than were actually present on the date of the outage is only significant if the relevant PG&E employees—the employees Rahman believes should have taken action in response to the notification—were aware of that discrepancy between Fiala's model and the actual conditions and disregarded the warning on that basis.  The same is true of any other purported defect in or limitation of Fiala's analysis.  PG&E's Motion is therefore GRANTED in part.  Neither Rahman nor any other witness may testify regarding the reasonableness, accuracy, or limitations of Fiala's analysis unless PG&E places the analysis at issue by arguing or presenting evidence that its employees did not take action in response to the Load at Risk Notification *because* the analysis underlying it was incomplete or incorrect.

### 3.   Opinions Regarding PG&E Load Shedding Scheme

Rahman's Amended and Supplemental Report adds the following conclusion, which Rahman originally presented in his Rebuttal report:

> Fifth, PG&E failed to update FWM with changes made to under-frequency load shedding at Tidewater substation. PG&E had initially informed FWM of the expected load shedding during underfrequency events but failed to update FWM when an underfrequency scheme at Tidewater was removed from service. Again, PG&E failed to communicate an important piece of information.

Rahman Supp'l Report at 22.[4]  According to Rahman, FWM "had good reason to believe that in an islanded situation, conditions would be such that they would continue to serve [the] Tesoro

---

[4] Although the Supplemental Report is largely excluded for the reasons discussed separately below, Rahman initially offered this opinion as a rebuttal to PG&E's expert's opinion that FWM failed to take appropriate corrective action when the system frequency at the Cogen declined in the period leading up to the outage. Rahman Rebuttal Report at 7.  Because the subject is addressed in his timely Rebuttal Report, Rahman in not precluded from offering testimony on it due to the untimely Supplemental Report.  This Order quotes the Supplemental Report because it summarizes the opinion at issue more succinctly than the Rebuttal Report.

United States District Court
Northern District of California

refinery load," in part based on representations regarding the load shedding scheme.  Rahman Rebuttal Report at 7.  "Load shedding" refers to a system to disconnect certain customers from a power source to reduce the total load on the power source.

Based on Rahman's reports and Tesoro's arguments, Tesoro does not appear to contend that the lack of a load shedding system was *itself* negligent—instead, Rahman's expert opinion is directed to PG&E's purported "[f]ailure to communicate this significant action," i.e., failure to inform Tesoro that PG&E had disabled the system.  *See* Rahman Rebuttal Report at 7.  As far as the Court is aware, the only evidence that FWM was aware of such a scheme is a memorandum prepared in 1986 regarding a meeting between FWM and PG&E.  *See id.*  Rahman testified at his deposition that, other than the 1986 memorandum, he was not aware of any evidence that either FWM or Tesoro relied on the existence of a PG&E load shedding scheme.  Rahman Dep. 83:23–84:5, 155:6–156:4.

Whether PG&E failed to advise FWM and Tesoro that it had disabled a load shedding system is only relevant if FWM or Tesoro relied on the system being operational.  PG&E's Motion is GRANTED in part, to the extent that Rahman may not testify regarding the purported removal of PG&E's load shedding system unless Tesoro lays an evidentiary foundation by presenting or proffering evidence from which an expert could conclude that either Tesoro or FWM relied on the existence of such a system.

### 4. Opinions Regarding FWM's Hypothetical Response to Notice from PG&E

A portion of Rahman's report analyzes PG&E's response to the disconnection of the transmission lines to the Substation, including the purported failure of PG&E's Grid Control Center to recognize alarms when the lines were disconnected.  *See* Rahman Report at 16−17.  He concludes that if PG&E had notified FWM of the first transmission line failure, "FWM and Tesoro would have had the appropriate time to prepare for a possible island condition."  *Id.*  As for the second failure, Rahman asserts that "[a]lthough there was limited time after loss of the second source, FWM would have had an opportunity to manually isolate themselves and the Tesoro refinery had PG&E altered [sic] them to the situation."  *Id.* at 17.  Rahman's ultimate conclusion on the subject reads as follows:

> Fourth, PG&E Grid Control Center operators failed to detect loss of the first and then second line feeding Tidewater. PG&E's failure to respond to the first line loss into Tidewater eliminated any opportunity for FWM to prepare for an islanding condition. Their failure to detect loss of the second line and necessity for PG&E East Bay Distribution Operations to inform the GCC of the situation is a serious lack of situational awareness.

*Id.* at 18.

PG&E objects primarily on the basis that Rahman did not know what FWM actually would have done if PG&E provided notice of one or both disconnections. *See* PG&E Mot. at 19 (citing, *e.g.*, Rahman Dep. 165:23–167:18; 168:17–22). Tesoro does not contend that Rahman is qualified to testify to how FWM would have actually responded to notice of disconnection. *See* Tesoro Opp'n at 10–12. Based on the limitations of both parties' positions, PG&E's Motion is GRANTED to the extent that Rahman may not testify to how FWM would have *actually* responded, but DENIED to the extent that Rahman may testify regarding the functions of the Grid Control Center, its failure to recognize alarms, what FWM *could* have done if given notice of the outages, and what a reasonable person in the industry would have done.

PG&E also argues that Rahman's conclusion that FWM "would have had an opportunity to manually isolate themselves" if notified of the loss of the second transmission line is "counterfactual" because Rahman himself testified that opening the relevant circuit breakers would take twenty minutes, but only three minutes elapsed between the loss of the second line and the Cogen tripping offline. PG&E Mot. at 19–20 (citing Rahman Dep. 215:8–20). In light of Rahman's testimony, the Court agrees that Rahman and Tesoro cannot satisfy *Daubert*'s reliability prong as to any testimony that FWM could have prevented a loss of power to the Refinery by opening the circuit breakers if FWM was first notified of a problem when the second transmission line was disconnected. PG&E's Motions is GRANTED to preclude any such testimony. This ruling does not affect testimony regarding how FWM could have responded if PG&E had promptly notified FWM of the first transmission line disconnection—including both (1) a scenario where FWM received notice of only the first line; and (2) a scenario where FWM received notice after each line was disconnected.

United States District Court
Northern District of California

### 5. Opinions Regarding Tesoro's Conduct

PG&E next argues that Rahman should not be permitted to testify as to whether Tesoro's conduct was reasonable, because Rahman's background and purported expertise lies in "'power system engineering, specifically as it relates to utility systems.'"  PG&E Mot. at 20 (quoting Rahman Dep. 13:18–19).  Tesoro observes in response that PG&E has not identified any specific portions of Rahman's reports or testimony that fall outside of his expertise, and argues that Rahman's background, while not relevant to the actual refining process, is relevant to assessing the conduct of a facility requiring a large and reliable supply of electricity.  Tesoro Opp'n at 12.

The parties have stipulated that "reliable electric power is critical to Refinery operations." Proposed Final Pretrial Order at 5, ¶ 11.  That having been established, an expert witness with a professional background in power system engineering may testify to appropriate practices for ensuring a reliable supply of electricity to a facility that requires it.  PG&E's Motion is DENIED as to Rahman's opinions regarding Tesoro's conduct in procuring electricity.

### 6. Opinions Regarding the Valero Special Protection Scheme and Documents Obtained Pursuant to a FERC Non-Disclosure Agreement

In addition to the Load at Risk Notification discussed above, Rahman's conclusion that PG&E was aware of the risk of an islanding situation is also based on the provision of a "Special Protection Scheme" ("SPS") for at least one other refinery with dedicated generation facilities: the Valero refinery served by PG&E's Bahia substation.  Rahman Report at 7–8.  If both of the transmission lines running to the Bahia substation are disconnected, "the Bahia/Valero SPS automatically separates the generation and refinery load" from the substation and its other customers by opening certain circuit breakers.  *Id.* at 8.  Rahman concluded that if PG&E had suggested installation of an SPS to Tesoro and FWM, the outage could have been averted.  *Id.*

PG&E argues that this opinion should be excluded because Tesoro failed to disclose that Rahman relied in part on a diagram that he obtained through a FERC non-disclosure agreement ("NDA").  PG&E Mot. at 21–23.  According to PG&E, Rahman's opinion regarding the SPS is subject to exclusion both because Rahman violated the terms of his NDA and because Tesoro failed to disclose that Rahman relied on the diagram.  *See id.*

12

1    PG&E cites no authority for the proposition that an expert witness may be precluded from

2    testifying to information because it is governed by an NDA.  It is not clear from PG&E's Motion

3    that PG&E has standing to assert the NDA, although PG&E asserted at oral argument that PG&E

4    would have been given an opportunity to object if Rahman had properly submitted a request to

5    FERC to use the information.  Moreover, PG&E's claim that Rahman improperly disclosed

6    confidential information rings hollow when PG&E itself filed multiple versions of Rahman's

7    report in the public record, including the portion based in part on the diagram Rahman received

8    from FERC.  Even if Rahman violated the NDA and PG&E has standing to object, PG&E has not

9    demonstrated that exclusion of testimony is an appropriate remedy for such a violation.  The Court

10   declines to exclude testimony on that basis, and need not address Tesoro's argument that

11   Rahman's use of the diagram was permissible under the NDA.

12       As for Rahman's and Tesoro's failure to disclose that Rahman relied on the diagram, the

13   Federal Rules of Civil Procedure require that any expert report disclose "the facts or data

14   considered by the witness in forming" his or her opinions.  Fed. R. Civ. P. 26(a)(2)(B)(ii).  "If a

15   party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is

16   not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a

17   trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).

18       Rahman and Tesoro violated Rule 26 by failing to disclose the fact that Rahman

19   considered the diagram from FERC.  PG&E does not, however, identify any harm resulting from

20   that failure.  PG&E learned during Rahman's deposition on July 27, 2015 that he had relied on the

21   diagram.  Rahman Dep. 169:8–14.  There is no dispute that PG&E had and has access to the same

22   diagram that Rahman obtained from FERC:

> MR. BEGLAND: I might be missing something, Laurie, but this is
> within your client's territory. So are you claiming you don't have
> access to this information?
>
> MS. EDELSTEIN: Nope.

26   *Id.* at 171:1–5.  The only specific use of the diagram that Rahman identified at his deposition was

27   to draw his own illustrative diagram of the Bahia/Valero SPS.  *Id.* at 169:3–14.  Rahman testified

28   that he relied on a number of other sources for his opinion regarding the SPS, including fact

United States District Court
Northern District of California

1  witnesses' deposition testimony and at least one document produced by PG&E regarding the

2  Bahia/Valero SPS.  *Id.* at 172:10–174:11.  PG&E does not assert failure to disclose reliance on

3  those sources.

4       Although Rahman's failure to disclose his use of the FERC diagram is concerning, PG&E

5  has failed to establish any harm as a result.  The Court therefore finds the lack of disclosure

6  harmless and declines to sanction Tesoro under Rule 37.  PG&E's Motion to exclude testimony

7  regarding the Bahia/Valero SPS is DENIED.

8               **7.  Propriety of Supplemental Report**

9       On November 3, 2015, Tesoro served Rahman's "Amended and Supplemental Report" on

10  PG&E.  *See generally* Rahman Supp'l Report.  The Supplemental Report includes three

11  substantive changes: (1) altering Rahman's analysis of Sebastian Fiala's Load at Risk Analysis to

12  account for new "base case" load data produced by PG&E after Rahman was deposed, *id.* at 4–5;

13  (2) adding several paragraphs discussing the "tradition of communicating and coordinating

14  maintainance [sic] work on the electrical system" among PG&E, FWM, and Tesoro, including

15  specific instances of such communication in 2005 and 2009, *id.* at 6–7; and (3) adding an opinion

16  regarding PG&E's failure to communicate the purported disabling of a load shedding system,

17  which was not included in Rahman's original Report but was addressed in his timely filed

18  Rebuttal Report, *id.* at 19–20, 22.  *See also* Jackel Decl. Ex. 16 (redline prepared by PG&E's

19  counsel comparing Rahman's original and supplemental reports).

20       PG&E moves to strike the supplemental report in its entirety—except for the addition of

21  certain data underlying Fiala's Load at Risk Notification that PG&E provided to Tesoro after

22  Rahman's deposition—on the grounds that (1) it does not comply with Court-ordered deadlines

23  under Rule 16; and (2) it is not allowed by Rule 26(e) because it is intended for Tesoro's benefit

24  and adds or bolsters theories rather than correcting inaccuracies.

25       Because PG&E does not object to the use of the new "base case" data related to the Load

26  at Risk Notification, the Court also declines to strike Rahman's analysis of that data, which

27  reaches substantially the same conclusion as his original Report—that Fiala reasonably concluded

28

United States District Court
Northern District of California

that the Cogen would trip offline if the Substation became islanded.[5]  The third change, regarding the purported removal of PG&E's load shedding system, is substantially similar to an opinion stated in Rahman's Rebuttal Report.  Rahman may testify on that issue regardless of whether the Court strikes the Supplemental Report.  The analysis of this section therefore focuses on the second change, regarding the purported tradition of communication and coordination among the parties and FWM.

On September 5, 2014, the Court issued a Case Management and Pretrial Order setting the following deadlines:

> A.  All non-expert discovery shall be completed by April 3, 2015.
>
> B.  All expert disclosures required by the Federal Rules of Civil Procedure shall be made by May 1, 2015.  Expert rebuttal disclosures shall be made by May 29, 2015.
>
> C.  All discovery from experts shall be completed by June 26, 2015.

Case Management and Pretrial Order (dkt. 52) at 1–2.  On April 10, 2015, the Court adopted the parties' stipulation to modify the original schedule so that expert disclosures would be due June 19, 2015, rebuttal disclosures would be due July 17, 2015, and the "expert discovery cut-off date" would be July 31, 2015.  Revised Stipulation and Order to Modify Scheduling Order (dkt. 63) at 3. Tesoro served Rahman's supplemental report more than three months after the close of expert discovery.

Based on the Court's Order in this case dated September 28, 2015,[6] the parties should be well aware of the standard to modify a scheduling order under Rule 16 of the Federal Rules of Civil Procedure, which provides that scheduling orders "may be modified only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4).  The Ninth Circuit has established a standard for such modification that focuses on the diligence of the party seeking relief from a deadline:

> Unlike Rule 15(a)'s liberal amendment policy . . . , Rule 16(b)'s "good cause" standard primarily considers the diligence of the party seeking the amendment. The district court may modify the pretrial

---

[5] As discussed separately above, Rahman may only testify to the reasonableness of Fiala's analysis if PG&E opens the door to such testimony.

[6] *Tesoro Ref. & Mktg. Co. LLC v. Pac. Gas & Elec. Co.*, No. 14-cv-00930-JCS, 2015 WL 5675861 (N.D. Cal. Sept. 28, 2015).

schedule "if it cannot reasonably be met despite the diligence of the party seeking the extension." Fed. R. Civ. P. 16 advisory committee's notes (1983 amendment). Moreover, carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief. Although the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for seeking modification. If that party was not diligent, the inquiry should end.

*Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992) (citations omitted).

Tesoro offers no explanation whatsoever for Rahman's failure to address the history of communication among the parties and FWM before the expert discovery deadline set by the Court's Order adopting the parties' stipulated modifications to the case schedule. *See generally* Tesoro Opp'n. Instead, Tesoro argues that the deadline set by the Court's Order does not apply because Rule 26(e)(2) permits "additions or changes" to expert reports until the deadline for pretrial disclosures under Rule 26(a)(3)—here, December 18, 2015.

Rule 26(e) reads, in full, as follows:

(1) In General. A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response:

(A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or

(B) as ordered by the court.

(2) Expert Witness. For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's *duty to supplement* extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.

Fed. R. Civ. P. 26(e) (emphasis added).

"Duties are usually owed to other people, and are not for the benefit of the party who has the duty." *Sandata Techs., Inc. v. Infocrossing, Inc.*, No. 05 CIV. 09546 (LMM) (THK), 2007 WL 4157163, at *7 (S.D.N.Y. Nov. 16, 2007) (holding that a party could not invoke Rule 26(e) to amend an expert report for its own benefit). The Middle District of North Carolina addressed the

16

United States District Court
Northern District of California

scope of Rule 26(e) supplementation in *Akeva L.L.C. v. Mizuno Corp.*:

> Rule 26(e)(1) requires supplementation when a "party learns that in some material respect the information disclosed is incomplete or incorrect." If the additional or corrective information has not otherwise been made known, a party must disclose at the times set out in Rule 26(a). . . . Plaintiff does not argue that [its expert's] initial opinion was incorrect, but appears to argue that it was incomplete. The Court cannot accept a definition of supplementation which would essentially allow for unlimited bolstering of expert opinions. Rule 26(e) envisions supplementation when a party's discovery disclosures happen to be defective in some way so that the disclosure was incorrect or incomplete and, therefore, misleading. *See Keener v. United States*, 181 F.R.D. 639 (D. Mont. 1998). It does not cover failures of omission because the expert did an inadequate or incomplete preparation. *Id.* at 641; *see Schweizer v. DEKALB Swine Breeders, Inc.*, 954 F. Supp. 1495, 1510 (D. Kan. 1997) (no reason opinions could not have been stated earlier). To construe supplementation to apply whenever a party wants to bolster or submit additional expert opinions would [wreak] havoc in docket control and amount to unlimited expert opinion preparation.

*Akeva L.L.C. v. Mizuno Corp.*, 212 F.R.D. 306, 310 (M.D.N.C. 2002); *see also Medtronic Vascular, Inc. v. Abbot Cardiovascular Systems, Inc.*, No. C-06-1066 PJH (EMC), 2008 WL 4601038, at *1 (N.D. Cal. Oct. 15, 2008) (citing *Akeva* with approval); *Pac. Info. Res., Inc. v. Musselman*, No. C06-2306 MMC (BZ), 2008 WL 2338505, at *1 (N.D. Cal. June 4, 2008) (same).

   *Medtronic Vascular, Inc. v. Abbot Cardiovascular Systems, Inc.*, a case on which Tesoro relies, presents a useful contrast. *See* Tesoro Opp'n at 20 (citing *Medtronic*, No. C-06-1066 PJH (EMC), 2008 WL 4601038, (N.D. Cal. Oct. 15, 2008)). There, Judge Chen declined to strike a supplemental expert report submitted after the deadline for expert discovery but before the deadline for pretrial disclosures because the expert "made honest mistakes in his original report which, once exposed during the deposition, Medtronic promptly sought to remedy" by submitting a supplemental report that corrected "numerical errors." *Medtronic*, 2008 WL 4601038, at *2. The correction in *Medtronic* is analogous to the new base case data here, which, as discussed above, PG&E does not object to and the Court declines to strike. The second addition to Rahman's Supplemental Report, however, simply adds new analysis of the parties' history of communication and cooperation regarding maintenance of electrical systems—a topic that Rahman had previously declined to address in his initial Report, Rebuttal Report, or deposition.

   The Court holds that this addition to Rahman's report falls outside the scope of Rule 26(e).

It is therefore untimely under the discovery schedule set by the Court's Order.  Because Tesoro has not shown diligence, there is no basis to deviate from that schedule under Rule 16.  *See Johnson*, 975 F.2d at 609. Under the rule stated by the Ninth Circuit in *Johnson*, Tesoro's failure to demonstrate diligence would require the Court to deny a request by Tesoro for relief from the scheduling order had Tesoro made such a request—regardless of whether the modification would prejudice PG&E.  The Court finds no justification for a different outcome where Tesoro has asked for forgiveness rather than for permission, and accordingly declines to address the parties' arguments regarding prejudice.[7]

Because Tesoro has not shown diligence justifying the delay in disclosing Rahman's opinion regarding that parties' history of communication, PG&E's motion to strike Rahman's Amended and Supplemental Report is GRANTED as to that opinion.

### C.   Tesoro's Motion to Exclude Swanson's Testimony

Tesoro moves to exclude testimony from PG&E's expert Richard Swanson regarding three opinions stated in his report: (1) that "[i]t was [FWM's] responsibility to maintain a viable separation scheme," Tesoro Mot. at 5 (quoting Swanson Report ¶ 16); (2) that "[t]he loss of supply of electricity to the Tesoro refinery was not caused by the loss of voltage at the Tidewater Substation, but due to the failure of supply from [FWM]," *see id.* at 11 (quoting Swanson Report ¶ 15; and (3) in rebuttal to Rahman's opinion that PG&E understood the risk that islanding would cause the Cogen to trip offline based on Fiala's Load at Risk Notification, that PG&E's understanding of FWM and Tesoro's systems was "limited, incomplete and unconfirmed" and that Swanson "doubt[s] that Mr. Fiala had sufficient information to do a comprehensive study of the [FWM]/Tesoro supply a distribution systems to come to a comprehensive opinion," *see id.* at 16–18 (quoting Swanson Rebuttal Report ¶ 29; Swanson Dep. 130:12–16).

---

[7] The Southern District of California allowed belated amendment under somewhat similar circumstances in *Qualcomm Inc. v. Broadcom Corp.*, No. 05CV1958-B (BLM), 2006 WL 5201392 (S.D. Cal. Dec. 14, 2006).  However, that case is distinguishable because "both parties contributed to the delay in the completion and service of the Supplemental Report." *Id.* at *3.  To the extent that the *Qualcomm* court based its decision on lack of prejudice to Broadcom rather than diligence by Qualcomm, the Court respectfully disagrees that such an approach is consistent with rule stated by the Ninth Circuit in *Johnson*.

United States District Court
Northern District of California

**1.   Opinions Regarding Responsibility to Maintain Separation Scheme**

Swanson opines in his Report that the Cogen likely tripped offline not because the combined load of the Refinery and the Concord customers exceeded its generating capacity (as Rahman believes) but instead because the Cogen was neither automatically nor manually switched from "droop" mode to "isochronous" mode.  *See* Swanson Report ¶ 106.  In droop mode, the Cogen sets its frequency based on PG&E's grid; in isochronous mode, the Cogen sets its own frequency.  *See id.* ¶¶ 54; 89.  According to Swanson, FWM's procedures called for switching to isochronous mode if the Cogen became islanded.  *Id.* ¶ 106.

One of the primary conclusions of Swanson's Report is that "[i]t was [FWM's] responsibility to maintain a viable separation scheme, which was meant to invoke isochronous control of its generation," and FWM "failed to do so."  *Id.* ¶ 16.  Tesoro understands the portion of the report addressing FWM's purported "responsibility" to state a legal conclusion outside of Swanson's expertise, and asks the Court to exclude such testimony.  Tesoro Mot. at 5.  Tesoro argues that expert testimony as to legal conclusions is improper, and that Swanson admitted a lack of knowledge regarding CPUC tariff rules potentially relevant to determining PG&E's and FWM's respective obligations.  *See* Tesoro Mot. at 6 (citing, *e.g.*, Swanson Dep. 285:20–287:22).

"[A]n expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law[; . . .] instructing the jury as to the applicable law is the distinct and exclusive province of the court."  *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (citations and internal quotation marks omitted).  The Court agrees with Tesoro that testimony regarding FWM's "responsibility" to provide a given contingency system crosses the line to at least imply a legal obligation.  While the Ninth Circuit also held in *Hangarter* that an expert may rely on his understanding of the law and refer to the law in expressing an opinion regarding industry norms, *see id.* at 1017, Swanson has not established any expertise in applicable legal authorities.  Particularly given Swanson's deposition testimony that he has no legal training, no experience with the legal effect of PG&E tariff rules, and no understanding of the "interplay" between tariff rules and other documents like PG&E's interconnection handbook, such testimony is not appropriate here.  *See* Swanson Dep. 15:6–20, 285:24–286:1, 287:13–33.  Tesoro's Motion

is GRANTED to exclude testimony regarding FWM's responsibilities.

Swanson may, however, testify based on his experience in the industry regarding industry standards and express an opinion as to whether FWM's systems were consistent with those standards. *See Hangarter*, 373 F.3d at 1016 ("Defendants contend that Caliri's testimony that Defendants failed to comport with industry standards inappropriately reached legal conclusions on the issue of bad faith and improperly instructed the jury on the applicable law. This argument is unavailing. . . . While Caliri's testimony that Defendants deviated from industry standards supported a finding that they acted in bad faith, Caliri never testified that he had reached a legal conclusion that Defendants actually acted in bad faith (i.e., an ultimate issue of law)."). He may also express opinions regarding the Cogen's capacity to operate in the event that it became islanded. All of these points can be made without framing the issue as whether FWM "was responsible" or had a "responsibility" to provide the failsafe systems at issue, which needlessly tends to create confusion as to whether Swanson is opining on FWM's legal obligations—a question he largely admits he is not qualified to address.

Tesoro also notes in passing that Swanson's report refers to the clause of PG&E Tariff Rule 14 barring liability for "other transmission related outage[s]." *See* Tesoro Mot. at 7 (citing Swanson Report ¶ 29). The Court previously held that clause inapplicable to this case. *See Tesoro Ref. & Mktg. Co. LLC v. Pac. Gas & Elec. Co.*, __ F. Supp. 3d __, No. 14-CV-00930-JCS, 2015 WL 7350446, at *1 (N.D. Cal. Nov. 20, 2015). Neither Swanson nor any other witness may testify regarding that clause.

### 2. Opinions Regarding Causation

One of Swanson's other primary opinions is that "[t]he loss of supply of electricity to the Tesoro refinery was not caused by the loss of voltage at the Tidewater Substation, but due to the failure of supply from [FWM]." Swanson Report ¶ 15. Tesoro argues that this opinion should be excluded for multiple reasons: (1) Swanson admittedly did not address the issue of how or why the Tidewater Substation became disconnected from the PG&E grid, and relied on documents provided by PG&E's counsel rather than conducted an independent investigation, Tesoro Mot. at 8–12; (2) Swanson "made no attempt to determine if the three minutes in which the Cogen

United States District Court
Northern District of California

1   personnel could have observed the frequency decay was an adequate amount of time to diagnose

2   the problem and manually island the Cogen," *id.* at 12–13; (3) Swanson's research was not

3   adequate to support his conclusion rejecting overload as the reason that the Cogen went offline, *id.*

4   at 13–14; and (4) Swanson's report "was not subject to any meaningful peer review," *id.* at 14–15.

5          As a starting point, it is not clear what Swanson means by his statement that the Refinery

6   outage "was not caused by" the Substation outage. *See* Swanson Report ¶ 15.  If he means that it

7   was not a but-for cause—i.e., that the Refinery would have lost power on November 10, 2010

8   even if the transmission lines from Pittsburg and El Sobrante to the Substation had never been

9   disconnected—that conclusion is not supported by Swanson's report.  Even accepting Swanson's

10  version of all facts leading up to the Refinery outage, the Cogen would have had no need to switch

11  from droop mode to isochronous mode if the Substation had remained connected to the PG&E

12  grid, and thus would not have gone offline. *See id.* ¶ 106.[8]  Because it is not supported by

13  Swanson's version of the facts, a conclusion that the Substation outage was not a but-for cause of

14  the Refinery outage is not "based on sufficient facts or data" to be admissible.  *See* Fed. R. Evid.

15  702(b).  On the other hand, if Swanson means that the Substation outage was not a *legally*

16  *actionable* cause of the Refinery outage, that would be "an opinion on an ultimate issue of law"

17  that is not only outside the scope of his expertise, but also an inherently improper subject of expert

18  testimony. *See Hangarter*, 373 F.3d at 1016.  Neither interpretation of Swanson's statement

19  regarding causation is permissible.  Accordingly, Tesoro's Motion is GRANTED to the extent that

20  Swanson may not testify that "[t]he loss of supply of electricity to the Tesoro refinery was not

21  caused by the loss of voltage at the Tidewater Substation."  *See* Swanson Report ¶ 15.  In other

22  words, he may not testify that the Substation outage was not *a* cause of the Refinery outage.

23         What the parties appear to primarily dispute, however, is why the Cogen tripped offline

24  and whether it should have remained online and providing power to the Refinery after the

25  Substation lost its connection to the PG&E grid.  Expert testimony directed to those issues may be

26

27  [8] There was some dispute at the hearing as to whether the Substation outage was a but-for cause of
    the Refinery outage.  Nothing stated at the hearing alters the Court's understanding that, in the
28  context of Swanson's theory of causation, the need to switch the Cogen from droop mode to
    isochronous mode arose from the Substation having been disconnected from the grid.

United States District Court
Northern District of California

helpful to the jury in resolving the case.  The Court therefore addresses Tesoro's arguments that Swanson's opinions on those issues are not adequately reliable.

First, the decision to limit Swanson's report to the question of why the Cogen tripped offline after the Substation lost power—without addressing why the Substation lost power—does not undermine Swanson's conclusions regarding the issue he chose to examine.  Tesoro fails to explain why Swanson would need to understand the cause of the Substation outage in order to understand how the Cogen actually responded, and/or should have responded, to that outage.  *See* Tesoro Mot. at 8–12.  Further, because Swanson's "failing to conduct any investigation into the outage at the Tidewater Substation" is the only purportedly significant consequence that Tesoro identifies of Swanson relying on documents provided by PG&E's counsel rather than conducting his own investigation, the Court finds that Swanson's reliance on documents provided by counsel is also not a sufficient reason to exclude his testimony.

Second, Tesoro argues that Swanson's causation opinion is flawed because he "made no attempt to determine if the three minutes in which the Cogen personnel could have observed the frequency decay was an adequate amount of time to diagnose the problem and manually island the Cogen, before switching to isochronous operation."  Tesoro Mot. at 12 (footnote omitted).  Tesoro is correct that Swanson testified to a lack of knowledge of whether FWM operators could have opened the 472 and 482 circuit breakers—which connect the Cogen to the Substation and PG&E's Concord customer—within three minutes.  *See* Swanson Dep. 250:1–25.  Tesoro's Motion is therefore GRANTED to the extent that Swanson may not testify to the feasibility of opening those circuit breakers within three minutes, or to any opinion that is dependent on that being feasible.  However, PG&E asserts that other evidence indicates that FWM could have switched the Cogen to isochronous mode without opening the 472 and 482 circuit breakers.  *See* PG&E Opp'n at 12.  If Swanson's opinion that FWM could have adequately responded within three minutes is not dependent on FWM being able to open the circuit breakers, he may present such a factual foundation and the opinion at trial, and Tesoro can cross examine him regarding its basis.

Third, Tesoro focuses on deposition testimony in which Swanson failed to cite specific evidence that the Cogen could exceed its rated capacity of 99.9 megawatts and noted that he was

not aware of whether governors at the Cogen limited its generating capacity.  However, the Cogen's manager Mike Kromer testified at his deposition that the Cogen could in theory "probably produce up to 114 megawatts" and did not "have any mechanisms in place that would physically prevent it from generating more than 99.9 megawatts"—i.e., a governor—other than the human operator.  Jackel Ex. 21 (Kromer Dep., dkt. 126-7) 25:6–12.  Swanson reviewed Kromer's deposition testimony and cited it throughout his report.  *See* Swanson Report & App'x A.  His failure to recall that evidence at his deposition is not sufficient to exclude opinions that are plausibly supported by Kromer's testimony.  There is some question as to whether Swanson adequately considered the Cogen's ability to rapidly take on additional load from PG&E's Concord customers, but while that may be a suitable topic for cross examination, the Court finds that it does not warrant excluding his testimony.

Tesoro also disputes Swanson's assertion that there is no evidence of a load shedding scheme or overload relays having operated, with Tesoro citing evidence that "the Cogen's Load Shedding Scheme did in fact activate."  Tesoro Mot. at 14.  PG&E responds that the evidence indicates that the load shedding scheme activated only after some of the turbines at the Cogen had tripped offline, which does not undermine Swanson's conclusion that the addition of the Concord customers did not overload the Cogen.  PG&E Opp'n at 14.  While Swanson could have phrased his assertion regarding the evidence more carefully, the Court agrees with PG&E as to both the nature of the evidence and its implication on the basis for Swanson's opinion.  Swanson may testify to his opinion that the lack of load shedding *before Cogen turbines went offline* indicates that the Cogen was not overloaded.

Finally, Tesoro objects that "Swanson's causation opinion should be excluded because Swanson admitted during deposition that his report was not subject to any meaningful peer review."  Tesoro Mot. at 14 (citing *Daubert*, 509 U.S. at 593–94).  The Court agrees with PG&E that Judge Patel's analysis in *A & M Records, Inc. v. Napster, Inc.* applies:

> [Plaintiffs' expert] Teece examined depositions and documents produced in conjunction with this litigation, as well as outside studies and media reports. His conclusions were drawn from consideration of Napster, Inc.'s internal documents. Although the Teece Report has not undergone peer review, it is not the type of

United States District Court
Northern District of California

United States District Court
Northern District of California

> document that is ordinarily subject to such scrutiny. See *Daubert*, 509 U.S. at 594  (stating that peer-review factor is not dispositive). The Teece Report comports with the standards that professional economists generally follow. Accordingly, defendant's objections to it are overruled.

*A & M Records, Inc. v. Napster, Inc.*, No. C000074MHP, 2000 WL 1170106, at *6 (N.D. Cal. Aug. 10, 2000).  Swanson was asked to review documents in light of his experience in the field. His report is not the sort of novel scientific or academic work for which peer review is typically required.  Tesoro has made no showing that the standards for electrical engineering consultants generally require peer review before issuing a report.

### 3.   Opinions Regarding Load at Risk Notification

In response to Rahman's opinion that PG&E was aware of a risk that the Cogen would trip offline if it was part of an "island" with PG&E's Concord customers, Swanson included the following statement in his rebuttal report:

> Regarding this assertion by Mr. Rahman, it is important to note that PG&E's understanding of [FWM's] facility and Tesoro's refinery was limited to the connection between PG&E and [FWM] through [FWM's] circuit breakers 472 and 482. Any other information PG&E may have had regarding the [FWM] and Tesoro systems was limited, incomplete and unconfirmed. To base any firm conclusions on the basis of what PG&E knew, might have known or might have assumed, would be speculative and unreliable.

Swanson Rebuttal Report ¶ 29.  Tesoro seeks to exclude testimony from Swanson regarding PG&E's knowledge of risk, arguing that Swanson is not qualified to testify to what PG&E knew because he admitted at his deposition that he had not reviewed Sebastian Fiala's work or seen the basis for Fiala's Load at Risk Notification, *see* Tesoro Mot. at 16–19 (quoting Swanson Dep. 127:24–131:20), which stated that an island would "likely cause Foster Wheeler units to trip offline post contingency."

PG&E argues that Fiala's deposition testimony establishes that he lacked sufficient information to make a reliable prediction regarding the likely effect of an island on the Cogen. *See* PG&E Opp'n at 16.  That may be so, but Swanson specifically testified that he did not know the basis for Fiala's Load at Risk Notification, and implied that he could only speculate as to its sufficiency.  *See* Swanson Dep. 130:10–16 ("I don't have Mr. Fiala's work, so I can't -- I can't criticize them, and I cannot condone them except to say that I doubt that Mr. Fiala had sufficient

24

1   information to do a comprehensive study of the MCLP/Tesoro supply and distribution systems to

2   come to a comprehensive opinion.").  Having testified that he lacked knowledge of the basis for

3   Fiala's work, Swanson may not testify at trial that Fiala lacked a sufficient basis to predict the risk

4   of the Cogen going offline.  Tesoro's Motion is GRANTED to the extent that such testimony is

5   excluded.

6       This Order does not, however, limit Swanson's ability to testify regarding the nature and

7   purpose of a Load at Risk Notification.  Further, if Swanson has a basis that is unrelated to Fiala's

8   analysis for his opinion that PG&E lacked relevant knowledge, he may proffer that basis and, if it

9   is adequate, testify to that opinion, subject to cross examination regarding Fiala's analysis.  Fiala

10  of course also remains free to testify as a percipient witness regarding the basis for and purpose of

11  the notification he prepared.

12  **IV.    ANALYSIS OF MOTIONS IN LIMINE**

13      **A.    PG&E's Motions in Limine**

14          **1.    PG&E's First Motion in Limine**

15      Following the outage, PG&E prepared a Root Cause Analysis focused on why the circuit

16  breakers on the transmission lines connecting the Substation to the PG&E grid opened.  PG&E's

17  analysis did not address why the Cogen tripped offline after those circuit breakers opened.  PG&E

18  now moves to exclude as irrelevant evidence and argument that the Root Cause Analysis "was

19  incomplete or inaccurate insofar as it failed to address issues outside the purpose and scope of the

20  report."  PG&E 1st Mot. in Limine ("MiL") (dkt. 149) at 2.  According to PG&E, such evidence is

21  inadmissible because it is irrelevant and would tend to confuse the issues.  *Id.* at 5 (citing Fed. R.

22  Evid. 401, 402, 403).

23      PG&E's expert witness Richard Swanson relied on "the conclusions or indeed, in some

24  cases, lack of conclusions that [PG&E] came to" in the Root Cause Analysis in formulating the

25  opinions he will present at trial.  Begland Decl. (dkt. 149-3) Ex. 1 (Swanson Dep.) 77:6−7.  The

26  accuracy and completeness of the analysis is therefore relevant, and PG&E's Motion in Limine is

27  DENIED.  If testimony at trial indicates that the Root Cause Analysis was incomplete, PG&E may

28  address the intended scope of the analysis on cross examination.

United States District Court
Northern District of California

PG&E also argues that it is unfair for Tesoro to introduce evidence related to PG&E's

Root Cause Analysis when Tesoro has refused to produce its own analysis, which Tesoro claims is

protected as attorney work product.  PG&E 1st MiL at 6−7.  PG&E asserts that if the Court allows

Tesoro to use PG&E's analysis, the Court should compel Tesoro to produce its own analysis.  *Id.*

As discussed above in the context of the parties' *Daubert* motions, the period for discovery in this

case ended long ago.  To the extent that PG&E's present Motion could be construed as a motion to

compel, it is DENIED as untimely.

### 2.  PG&E's Second Motion in Limine

Next, PG&E moves to exclude evidence or argument that, as stated in Tesoro's First

Amended Complaint ("FAC," dkt. 28), PG&E breached its obligation to Tesoro by failing to

"stand ready at all times to delivery or supply and delivery electric energy to [Tesoro's] premises

on an as-needed basis."  PG&E 2d MiL (dkt. 150) at 1 (quoting FAC ¶ 17).

The parties agree that the contract at issue in this case (the "Standby Agreement," FAC Ex.

A) explicitly incorporates PG&E Electric Schedule S, which sets certain terms for the provision of

standby electrical service.  PG&E is correct, however, that this portion of Tesoro's Complaint at

issue quotes a sample form that is not incorporated by Schedule S or the contract, and is therefore

not relevant to the case.  Tesoro argues that Schedule S itself includes similar language. Opp'n to

PG&E 2d MiL (dkt. 150-1) at 2. As discussed at the hearing, however, the paragraph that Tesoro

cites describes one type of *customer* that the Schedule pertains to.  It does not establish PG&E's

duties.  *See* Schedule S ("PG&E will supply electricity and capacity on a standby basis under the

terms of this schedule for *customers:* . . . *c. who* require PG&E to provide reserve capacity and

stand ready at all times to supply electricity on an irregular or noncontinuous basis.").

The Standby Agreement itself presents two options:

> XX  Option A - Standby for Nonutility-Owned Generation
>
> Applicant is served by nonutility-owned electric power generating
> equipment (Generating Facility) . . . which supplies on a regular
> basis, all or a portion of Applicant's load. Applicant has requested
> that PGandE standby to provide electric power to Applicant's
> premises during times of shutdown or failure of Generating Facility.
> . . .

United States District Court
Northern District of California

__ Option B - Other Standby

> Applicant has request that PGandE provide reserve capacity and stand ready at all times to supply electricity where the use of electric service is not of a usual, regular or continuous character, or is supplied . . . from another utility and that utility consented to this agreement.

Standby Agreement, FAC Ex. A at ECF p. 24.  "Option A" is checked; "Option B" is not checked. PG&E's Motion is therefore GRANTED to the extent that Tesoro may not rely on the "stand ready at all times" language of any of the following: (1) the sample form quoted in the FAC; (2) paragraph c. of Schedule S describing certain customers to whom the Schedule pertains; or (3) Option B of the Standby Agreement.  None of those sources describe a legal duty that PG&E owes to Tesoro.

This holding does not preclude Tesoro from arguing that PG&E had a contractual obligation to provide electricity.  Option A of the Standby Agreement—the option that the parties to that agreement selected—indicates that it is an agreement for PG&E to "standby to provide electric power to [Tesoro's] premises during times of shutdown or failure of [the Cogen]." Schedule S provides that PG&E "will supply electricity and capacity on a standby basis."  Tesoro is free to reference those provisions at trial.

### 3.  PG&E's Third Motion in Limine

PG&E's third Motion in Limine seeks to exclude references to "acts of PG&E or ensuing regulatory, civil, or criminal proceedings that are not related to the November 10, 2010 Refinery outage," including an incident that occurred earlier in 2010 in which a PG&E natural gas pipeline exploded in San Bruno, California.  PG&E 3d MiL (dkt. 151) at ii, 1.  Tesoro's Opposition focuses on the San Bruno explosion, arguing that "it demonstrates that PG&E had a clear opportunity to review its history of deferring maintenance decisions" and rebuts "PG&E's anticipated evidence that it is a safety conscious company."  Opp'n to PG&E 3d MiL (dkt. 151-1) at 3.

Tesoro's argument here presents a sharp contrast to the position it takes in opposition to PG&E's *next* Motion in Limine, where Tesoro asserts the following:

> The San Bruno explosion had nothing to do with a refinery, or PG&E's delivery of electric power. *In short, it has nothing to do with the instant case.*

Opp'n to PG&E 4th MiL (dkt. 152-1) at 6 (emphasis added). The Court agrees.

Further, to whatever extent the San Bruno incident could be marginally relevant, the potential for unfair prejudice substantially outweighs any probative value. *See* Fed. R. Evid. 403. It is common knowledge in this district that the San Bruno explosion resulted in multiple deaths and widespread property damage. Suggesting to the jury that the case at hand is in some way related to that incident—when Tesoro itself admits that San Bruno "has nothing to do with the instant case"—needlessly introduces a risk that jurors would, consciously or unconsciously, seek to punish PG&E for the San Bruno explosion rather than resolve the case based on the evidence related to the Refinery outage. PG&E's Motion to exclude evidence and argument related to unrelated incidents, including the San Bruno explosion, is therefore GRANTED.[9]

### 4. PG&E's Fourth Motion in Limine

PG&E's fourth and final Motion in Limine seeks to exclude any evidence and argument "concerning risks of explosions, fire, and physical dangers from the Refinery's unplanned loss of power" on the basis that no such harm actually occurred. PG&E 4th MiL (dkt. 152) at ii, 1. Tesoro argues that PG&E's knowledge of such risks—or knowledge that PG&E should have had—is relevant to determine the precautionary measures that a duty of reasonable care would require PG&E to take. Opp'n to PG&E 4th MiL at 2.

"As the common law of torts long ago recognized, the rational calculation of risk requires multiplying the magnitude of a threatened loss by the probability of its occurrence." *Arrendondo v. Neven*, 763 F.3d 1122, 1131 (9th Cir. 2014) (citing *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947) (the source of the well-known "Hand formula" of negligence law)). While PG&E may owe the same duty of care to all of its customers, the precautions required by

---

[9] Based on PG&E's position that the Substation and Refinery outages here were distinct incidents with different causes, a very broad reading of PG&E's Motion could place the Substation outage within the scope of "acts of PG&E . . . not related to the events at issue." *See* PG&E MiL 3 at ii. PG&E does not appear to make that argument, but to be clear, evidence related to the Substation outage is not excluded.

United States District Court
Northern District of California

1    that duty will vary depending on the potential risks.

2        The California Supreme Court's decision in *Langley v. Pacific Gas and Electric Company*,

3    41 Cal. 2d 655 (1953), made clear that this principle applies to utilities.  In that case, the operator

4    of a trout hatchery sued PG&E for failing to notify him of an outage when PG&E had actual

5    knowledge both that the outage would harm the hatchery and that providing notice would have

6    allowed him to obtain an alternative source of power to mitigate the harm.  *See id.* at 657−59.

7    Much like in this case, PG&E argued that it had no special duty to notify the hatchery of the

8    outage because state policy required it to afford all customers the same treatment.  *Id.* at 662.  The

9    court rejected that argument, holding that awareness of special risks informs the steps that PG&E

10   must take based on its generally applicable duty of care:

> Defendant contends, however, that it is physically impossible for it
> to first ascertain the loss that may occur to each of its million
> customers in the event of a power failure, and then to take steps,
> other than diligent efforts to restore service, to diminish or prevent
> such losses. Defendant is under no duty to do so. In the absence of
> knowledge of the particular needs of a customer, a utility is not
> required to give notice of a power failure. If it has such knowledge,
> it is required only to act in a reasonable manner under the
> circumstances. It would not be unduly burdensome to a utility, at
> least in a case where, as here, a telephone operator is on duty and the
> utility has actual knowledge of the power failure, to require it to
> make a reasonable effort to give notice to those customers who have
> informed it that they require notice to prevent serious loss in the
> event of an interruption in the power supply.
>
> Defendant contends that to require it to give notice to certain
> customers and not to others conflicts with the public policy of this
> state that no public utility may grant any preference or advantage in
> its service to its customers. (Pub. Util. Code, § 453.) *Discrimination
> is not present however, since the same duty to exercise reasonable
> care and diligence is owed to all customers similarly situated.*

*Id.* at 661−62 (citations omitted; emphasis added).

        If PG&E knew that an outage at a refinery could cause types of harm not likely to result

from outages at other facilities, that knowledge could inform the steps that a reasonable utility

company would take to prevent such an outage, including the steps one might take after one or

both of the transmission lines to a substation serving a refinery became disconnected.  PG&E's

Motion is therefore DENIED, and Tesoro may introduce evidence that PG&E knew or should

have known of risks associated with power outages at refineries, including risks of harm that did

United States District Court
Northern District of California

not actually occur in this instance, such as fire or explosion.

The Court notes, however, that Tesoro must make such a showing through admissible evidence.  The denial of this Motion in Limine may not have a significant effect on the trial because it is not clear that Tesoro has any such evidence.  Tesoro's Opposition cites four newspaper articles regarding fires and explosions at refineries, attributing those results—with varying degrees of certainty—to power outages.  *See, e.g.*, Begland Decl. (dkt. 152-3) Ex. D ("Oil Refinery Explosion May Be Linked To Power Loss").  In determining what effects an outage could have had on Tesoro's Refinery, a handful of reports in the lay press are no substitute for expert testimony.  The Court can in some circumstances take judicial notice of news reports solely "to 'indicate what was in the public realm at the time, not whether the contents of those articles were in fact true.'"  *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2009).  Tesoro has not identified any independent evidence that the contents of the articles it cites are true—i.e., that power outages actually caused any fires or explosions at any refineries or have the potential to do so.[10]

### B.    Tesoro's Motions in Limine

#### 1.    Tesoro's First Motion in Limine

Tesoro seeks to exclude all evidence relating to reports that it submitted to county and state regulators, invoking a Contra Costa County ordinance that reads as follows:

> No part of the conclusions, findings or recommendations of the root cause analysis conducted by the department or stationary source, or incident investigation conducted by the department, relating to any major chemical accident or release or the investigation thereof shall be admitted as evidence or used in any action or suit for damages arising out of any matter mentioned in such report.

Contra Costa Cnty. Ord. Code § 450-8.016(c)(3).

As a starting point, Tesoro has made no showing that the incident following the November 2010 outage constituted a "major chemical accident or release" within the meaning of the

---

[10] The PG&E and CPUC documents that Tesoro cites in its Opposition state only that refineries are complex and sensitive, require reliable service, and may suffer irreparable loss or extended shutdown periods as a result of electrical outages.  *See* Opp'n to PG&E 4th MiL at 3.  Such evidence may be relevant to determining the nature of PG&E's duty to Tesoro, but does not establish a risk of fire, explosion, or personal injury.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    ordinance.  The ordinance includes a separate section addressing investigations of "incident[s]

2    which results resulted in, *or could reasonably have resulted in* a catastrophic release of a regulated

3    substance," *id.* § 450-8.016(a)(9)(A) (emphasis added), suggesting that not all investigation

4    reports submitted to the county necessarily relate to a "major chemical accident or release."  To

5    the extent that any of the materials at issue were submitted *only* to the county, Tesoro's Motion is

6    DENIED as to those materials without prejudice to renewal if Tesoro can demonstrate that the

7    incident at issue qualifies as a "major chemical accident or release."

8            Further, Tesoro seeks to exclude not only reports that it made to the county, but also

9    reports made to the regional Bay Area Air Quality Management District ("BAAQMD") and a

10   report prepared *by* the BAAQMD, on the basis that those reports "incorporated the findings and

11   conclusions presented in" the report to the county.  Tesoro 1st MiL (dkt. 141) at 3.  Tesoro does

12   not assert that any statute bars submissions to the BAAQMD from use in litigation merely by

13   virtue of the fact that they were submitted to the BAAQMD.

14           Tesoro's position is, essentially, that once it has submitted a report to Contra Costa County

15   that might be protected by the ordinance, it can extend that protection to cover its submissions to

16   other regulators by citing or incorporating the county report in those later submissions.  The Court

17   disagrees.  Whatever Tesoro chose to submit to the BAAQMD to meet its obligations set by that

18   regulatory body is not protected by the county ordinance, regardless of whether Tesoro also

19   previously submitted the same conclusions, or even the same documents, to Contra Costa County.

20   Tesoro's Motion is DENIED with prejudice as to materials that it chose to submit to the

21   BAAQMD or that the BAAQMD prepared.

22                          **2.  Tesoro's Second Motion in Limine**

23           On November 14, 2011, the BAAQMD issued a Notice of Violation (the "NOV")

24   regarding emissions from the Refinery as a result of the outage at issue in this case.  Tesoro seeks

25   to exclude the NOV on the grounds that: (1) it is derived from information protected by the Contra

26   Costa County ordinance discussed above; and (2) it is double hearsay, because it is itself an out of

27   court statement and also recounts statements that witnesses made during the BAAQMD

28   investigation.  *See* Tesoro 1st MiL (dkt. 144) at 1.  Tesoro argues that the hearsay exception for

                                                    31

public records does not apply because the NOV is not reliable.

Tesoro's first argument is rejected for the reasons stated above.  The Contra Costa ordinance does not cover reports made to other regulators such as the BAAQMD.

As for Tesoro's hearsay argument, the Federal Rules of Evidence specifically permit the introduction of public records setting forth "factual findings from a legally authorized investigation" unless the opposing party demonstrates "that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8).  Although Tesoro argues that the NOV is not trustworthy because it rests on an incorrect factual basis, the purported inaccuracies related to disputed issues of fact that the jury will need to resolve in this case. Tesoro's challenges to the factual basis of the NOV are better suited to cross examination than to a motion in limine.  The Court declines to hold the NOV untrustworthy as a matter of law, and accordingly finds that Rule 803(8) applies and DENIES Tesoro's motion to exclude the NOV as hearsay.  However, to the extent that the NOV explicitly recounts statements of witnesses, any party seeking to admit those statements must establish that they fall within an independent exception to the rule against hearsay.

### 3.  Tesoro's Third Motion in Limine

Tesoro also seeks to exclude evidence of compromise offers made during negotiations with the BAAQMD, on the basis that such evidence is inadmissible under Rule 408 of the Federal Rules of Evidence.  Tesoro 3d MiL (dkt. 145).  PG&E argues that that Tesoro has placed those negotiations at issue by seeking to recover the negotiated fine imposed by the BAAQMD as damages in this case.  Opp'n to Tesoro 3d MiL (dkt. 145-2).  At the hearing, after the Court indicated its intent to deny this Motion so long as the negotiated fines are at issue in the case, Tesoro waived its claim to damages based on the fine.  In light of that waiver, the Motion is GRANTED, and PG&E may not introduce evidence of compromise negotiations between Tesoro and the BAAQMD.

PG&E contends that portions of the negotiations should be admissible for purposes other than to show the underlying violation, such as "'evidence of facts disclosed during compromise negotiations.'"  *Id.* at 5 (quoting *Phoenix Solutions Inc. v. Wells Fargo Bank, N.A.*, 254 F.R.D.

United States District Court
Northern District of California

568, 584 (N.D. Cal. 2008)).  To whatever extent the negotiations might otherwise be admissible for such purposes, the Court holds that the potential to confuse the issues and cause unfair prejudice substantially outweighs any probative value.  *See* Fed. R. Evid. 403.

### 4. Tesoro's Fourth Motion in Limine

Tesoro's fourth Motion in Limine seeks to exclude references to other outages at the Cogen and the Refinery.  Tesoro 4th MiL (dkt. 147).  According to Tesoro, such evidence is not relevant to determine what occurred during the November 2010 outage at issue, and any marginal relevance is outweighed by the potential to cause unfair prejudice.  *Id.* at 2−3.  Tesoro also argues that evidence of other outages is impermissible character evidence under Rule 404.  *Id.* at 3−4.

The Court agrees with PG&E that the reliability of the Refinery's supply of electricity from the Cogen is relevant to the issue of potential contributory negligence.  Tesoro intends to offer testimony regarding the Refinery's "study of electrical reliability over the years."  Tesoro Witness List (dkt 154) at 7 (summarizing anticipated testimony of Kirti Shah).  PG&E's expert witness Richard Swanson will offer his opinion that Tesoro did not comply with industry best practices to ensure a reliable supply of electricity, and Tesoro's expert witness Brian Rahman will respond that it did.  Swanson Report ¶ 5; Rahman Rebuttal Report at 8−9.  Because the reliability of Tesoro's supply of electricity is at issue in the case, evidence of other outages at the Refinery is relevant, not overly prejudicial, and not barred by Rule 404.  Tesoro's motion to exclude such evidence is DENIED.

### 5. Tesoro's Fifth Motion in Limine

Finally, Tesoro moves to exclude evidence of and references to out of court statements by Larry Anderson, a contractor retained by Tesoro during its investigation of the November 2010 outage.  Tesoro 5th MiL (dkt. 146).  PG&E admits that Anderson's statements are hearsay but argues that they are relevant to show bias—specifically, "Tesoro's bias and intent to blame PG&E for the Refinery outage rather than to determine its actual cause."  Opp'n to Tesoro 5th MiL (dkt. 146-2) at 3.

"Bias is a term used in the 'common law of evidence' to describe the relationship between a party and a witness which might lead *the witness* to slant, unconsciously or otherwise, his

testimony in favor of or against a party." *United States v. Abel*, 469 U.S. 45, 52 (1984) (emphasis added).  PG&E has not identified any *witness* whose potential bias is implicated by Anderson's conclusions or Tesoro's reaction to those conclusions.  Even if PG&E had identified a permissible use, in light of the fact that Anderson's opinions relate to core factual disputes in the case but are not admissible for the truth of the matters asserted, the risk of confusion and unfair prejudice substantially outweighs any potential probative value.  Tesoro's motion to exclude this evidence is therefore GRANTED.

## V.      CONCLUSION

For the reasons stated above, each party's motion to exclude expert testimony is GRANTED IN PART AND DENIED IN PART.  Expert witnesses Rahman and Swanson may give testimony at trial consistent with this Order.  The Court's rulings on the motions in limine are set forth above.

**IT IS SO ORDERED.**

Dated: January 14, 2016

_____
JOSEPH C. SPERO
Chief Magistrate Judge